City of Philadelphia *v.* Southeastern Pennsylvania Transportation Authority.

Argued November 18, 1970, before President Judge BOWMAN, and Judges KRAMER, WILKINSON, JR., MAN-

DERINO, MENCER and BARBIERI. Judge CRUMLISH, JR., disqualified himself and did not participate in the argument or decision.

*Lewis H. Van Dusen, Jr.,* with him, *R. Philip Steinberg* and *Drinker, Biddle & Heath,* for appellant.

*Matthew W. Bullock, Jr.,* First Deputy City Solicitor, with him, *Levy Anderson,* City Solicitor, for appellee.

OPINION BY JUDGE KRAMER, filed December 9, 1970.

This case involves an appeal by the Southeastern Pennsylvania Transportation Authority (SEPTA) from an Order of the Common Pleas Court of Philadelphia dated September 25, 1970, which sustained an appeal of the City of Philadelphia (City) and remanded the matter back to SEPTA for action not inconsistent with the findings of the Court as set forth in its Opinion of that same date. In summary, the lower court found that SEPTA had committed a manifest and flagrant abuse of discretion in failing to honor its contractual obligations to the City in the filing of a plan on how SEPTA was to meet its rental payments to the City, and an error of law in the SEPTA Board overriding a veto of the two City board members, by calling a special board meeting instead of waiting for a regular board meeting.

As an aid in better understanding the history of this case, we set forth the following chronology of pertinent events:

| *Date* | *Description* |
|---|---|
| September 27, 1968, | Lease and leaseback agreement between SEPTA and the City of Philadelphia. |
| November 26, 1969, | Operating budget of SEPTA indicating deficit submitted to SEPTA Board. |
| January 20, 1970, | Letter from City Managing Director (Corleto) to the Chairman (McConnon) of |

SEPTA, calling attention to (1) the deficit, and (2) the provisions of an agreement with the City of Philadelphia calling for a plan to pay the fixed and additional rent due to the City, and making inquiry on what action SEPTA would take.

March 12, 1970, Letter from McConnon to Corleto, answering letter of January 20, 1970, above.

June 24, 1970, Tariff No. 1, supplement No. 3, which contained the proposed increased fares at issue in this case was first submitted to the SEPTA Board.

July 6, 1970, Letter from Chief Counsel of SEPTA (Van Dusen) to First Deputy City Solicitor (Bullock) enclosing a copy of the proposed tariff changes and statement on effect of fare proposal on rentals due City.

July 15, 1970, Letter from Bullock to Van Dusen requesting material on the proposed fare increases.

July 20, 1970, Letter from Van Dusen to Bullock enclosing detailed supporting data for proposed fare increases.

July 23, 24 and 27, 1970, Public hearings held on the proposed fare increases.

August 4, 1970, Notice sent of the regular meeting of SEPTA Board to be held on August 26, 1970.

August 12, 1970, Special Examiner filed his report recommending that the proposed fare increases be approved and that the Rate Tariff No. 1, supplement No. 3, should be adopted and put into effect.

August 13, 1970, Notice sent of special meeting of SEPTA Board to be held on August 18, 1970, to consider action on Special Examiner's report.

August 18, 1970, Special meeting of SEPTA Board held. Vote taken to approve the proposed fare increases, in which the two City of Philadelphia members of the Board were the only votes in opposi-

tion to the proposed fare increases, thereby invoking the veto provision of the Act.

August 26, 1970, Regular meeting of SEPTA Board held. Board again voted on the proposed fare increases, with the same resulting two negative votes.

August 27, 1970, City of Philadelphia filed an appeal with the Court of Common Pleas of Philadelphia County.

September 23, 1970, Regular meeting of SEPTA Board again approved the proposed fare increases by the same vote of 9 to 2.

September 25, 1970, Opinion and Order of the Court of Common Pleas of Philadelphia entered, upholding the appeal of the City (thereby rescinding the Board's action and making a fare increase invalid), and remanding the matter back to SEPTA for further action not inconsistent with the Opinion and Order of the Court.

September 25, 1970, SEPTA appealed to the Commonwealth Court.

November 25, 1970, Commonwealth Court reversed the Order of the Court of Common Pleas dated September 25, 1970.

The City concedes that the subsequent action of the SEPTA Board at its regular monthly meeting on September 23, 1970, cured the alleged defects in the procedure of the Board in approving the new tariff and therefore that issue is now moot. This Court ruled on the City's Motion to Quash by denying that motion.

The only remaining issue to be decided by this Court is whether SEPTA committed a manifest and flagrant abuse of discretion in failing to "honor its contractual obligations to file the required plan . . . designed to provide a level of net revenues at least equal to the fixed rent and additional rent" under Section 1.08 of its Agreement of September 27, 1968, with

the City of Philadelphia.* The lower court held that SEPTA had so abused its discretion; we hold that the lower court erred in that ruling.

To better comprehend the issues, we must first understand what SEPTA is. It is an authority. Authorities are creatures of the General Assembly and statutorily described as "a separate body corporate and politic". They are not entirely governmental, nor are they entirely private corporations. Yet they are partially both. *Evans v. W. Norriton Township Municipal Authority,* 370 Pa. 150, 87 A. 2d 474 (1952). For instance, it has the power of eminent domain (66 P.S. 2008). The governing board is appointed by elected officials of government (66 P.S. 2016). Although it has a corporate charter, it has no stockholders and is not supposed to earn any profits. In the case of *Simon Appeal,* 408 Pa. 464, 184 A. 2d 695 (1962) the court said: "It has been consistently held . . . that an authority is not a creature, agent, or representative of the municipality organizing it. A member of the board of a municipal authority was a public official by reason of the fact that such entity is an independent agen-

---

*The statistical financial statements presented by SEPTA show that based upon adjusted actual revenues and expenses for the year ending May 31, 1970, at existing fare levels, SEPTA is operating at a net loss of $1,610,734, before the payment of the rentals due the City of Philadelphia. Those rentals for the year 1970 consist of (1) Fixed Rentals in the amount of $2,047,080, (2) Cumulative Additional Rent in the amount of $2,803,387, and (3) Non-cumulative Additional Rent in the amount of $1,699,783. The latter of these three rentals is due only to the extent SEPTA has funds available each year above its other expenses. The first two rentals must be paid. Assuming all rentals are due, the total deficit for the test year is over $8,000,000. There is also evidence that the estimated deficit for the entire calendar year of 1970 will be an additional $2,000,000. Assuming that to be accurate, the present loss is running at the rate of about $190,000 per week. None of these statistical matters was made an issue before this Court.

cy of the Commonwealth and part of the sovereignty of the State". Once the Board has been appointed, however, it operates its facilities autonomously, subject only to court review.

Historically, authorities came into use in this State as a means to avoid constitutional limitations on governmental debt, and in some instances, even were used to develop some utilitarian service to a community where government would not or could not provide it because of legal, political or psychological complications.

Although in the beginning it was believed that authorities providing utility services were subject to regulations by the Pennsylvania Public Utility Commission (PUC), the Legislature in 1945 (Act of May 2, 1945, P. L. 164) made it clear that the legislative intent was to remove such regulatory supervision and to provide autonomous power over the authority's rates and services, subject only to review by the courts. An authority can do no more nor less than the statute, which breathes life into it, provides.

The relative merits or demerits of such a system is not for this Court to discuss, but rather is a matter for legislative debate. We can only address ourselves to what the Legislature has provided and rule on the issues presented under the statutes.

The record in this case suggests that there has been a lack of cooperation between SEPTA and the City. Certainly under a situation where the City of Philadelphia has underwritten a large portion of the financial burden of operating a transportation system, which benefits not only its residents but also the residents outside the city in four other counties, the SEPTA Board should have taken more active and decisive steps to keep the City better informed. It is obvious from this record, to one not even familiar with the personalities involved, that SEPTA, the City, and the other

county officials act as adversaries rather than as mutually interested partners in the business of providing the best possible transportation service at the lowest possible cost. This is especially true when we stop for a moment to realize that the vast majority of people who use mass public transportation are people of moderate means (the handicapped, the elderly, the students, the workers, etc.) who may not own an automobile or who cannot afford the high cost of parking in a metropolitan area.

This Court cannot help but be sympathetic to the people who will have to shoulder another increase in their cost of living if the fares of SEPTA are increased. This is especially so when the record in this case indicates that better cooperation and communication between SEPTA and the governmental officials of the City and the four counties might relieve the patrons of some of the increases requested. Most of the witnesses who testified at the public hearings held in this matter pointed out that no metropolitan mass transit system under present economic conditions can be operated profitably on fares alone. The evidence proves that SEPTA needs subsidy help.

Unfortunately, a court cannot substitute its discretion for that of SEPTA. Common sense suggests that SEPTA take the initiative in reorganzing its communication and improving its rapport with the officials of the City and the four other counties involved and set up a procedure satisfactory to all concerned, so that the misunderstandings found in this case are ameliorated. This is not to suggest that SEPTA give up the independence intended by the Legislature. SEPTA should never bow to the pressures of government officials to the detriment of its patrons; but certainly it would work to their patrons' benefit if SEPTA would take government officials into their confidence,

In *Schwartz v. Urban Redevelopment Authority*, 411 Pa. 530, 192 A. 2d 371 (1963), the court said: "The authority is a public body exercising public powers of the Commonwealth as an agency thereof . . . as a public body it stands in a fiduciary relationship to the public and the taxpayers, and its conduct must always be guided by the rule of good faith, fidelity and integrity."

It might even be helpful for SEPTA to look to the procedures outlined by the PUC for transportation utilities subject to PUC jurisdiction as a guide to a reasonable procedural approach. This Court, however, should not become a super board to patch up differences between authorities and governmental officials. We can only determine issues presented under the law.

In this case SEPTA was given the exclusive power to establish its rates or fares after providing an "appropriate public hearing". The exact statutory provisions are found in 66 P.S. 2004, "(d) A duly certified authority shall have . . . the following rights or powers: '(9) to fix, alter, charge and collect fares, rates, rentals and other charges for its facilities by zones or otherwise at reasonable rates to be determined *exclusively* by it, subject to appeal, as hereinafter provided, for the purpose of providing for the payment of all expenses and obligations of the authority, including the acquisition, construction, improvement, repair, maintenance and operation of its facilities and properties, the payment of the principal and interest on its obligations, and to comply fully with the terms and provisions of any agreements made with the purchasers or holders of any such obligations. The authority shall determine *by itself exclusively*, after appropriate public hearing, the facilities to be operated by it, the services to be available to the public, and the rates to be charged therefor. Any person aggrieved by any rate or service or change of service fixed by the authority

may bring an appeal against the authority in the court of common pleas of any county in the metropolitan area in which the charge, service or change of service, shall be applicable, for the purpose of protesting against any such charge, service, or change of service: Provided, however, that the grounds for such suit shall be restricted to a manifest and flagrant abuse of discretion or error of law; otherwise, all such actions by the authority shall be final. Whenever two or more appeals shall be brought against the same action of the authority, exclusive jurisdiction for the determination thereof shall be vested in the first such court to receive such an appeal, and all other courts receiving subsequent appeals against the same action shall transfer such appeals to the said first court. Upon the finding of an error of law or a manifest and flagrant abuse of discretion, the court shall issue an order setting forth the abuse or error and returning the matter to the authority for such further action as shall not be inconsistent with the findings of the court." (Emphasis added.) There is no provision in the statute that SEPTA must acquire prior approval for a fare increase from anyone, including the City of Philadelphia. SEPTA has the exclusive power to set its fares, and anyone aggrieved by its actions may appeal to the court. The identical legislative language on the exclusiveness of an authority's powers over services was discussed in *Yeziorio v. North Fayette County Municipal Authority*, 193 Pa. Super. 271, 164 A. 2d 129 (1960) where the court said: "The statutory provision to the effect that the services provided by the authority are to be determined 'by itself exclusively' must certainly have been intended to make it clear that the authority itself, not the creating municipality or some other instrumentality, control the initial determination of the service." This same principle applies to rates as well as to services.

The Legislature has provided some measure of protection to any aggrieved party by providing that a person may appeal an action of the SEPTA Board to a court of common pleas, as was done by the City of Philadelphia in this case. However, the grounds for appeal are specifically restricted to a manifest and flagrant abuse of discretion or error of law. Here the lower court found such an abuse of discretion in what the court deemed was a violation of a provision of an agreement dated September 27, 1968, between SEPTA and the City. There was no specific finding by the court of fraud, bad faith or arbitrariness, but rather a finding of a failure to honor the agreement. The pertinent provisions of that agreement are found in Section 1.08, which reads as follows: "1.08. The authority shall have the *absolute* right to fix its fares and other charges. If at any time it becomes apparent to the authority that the level of net revenues from the leased property is falling below the requirements of the Fixed Rent and the Additional Rent, the authority shall promptly study its fare structure and transportation services, and *shall formulate a plan* with respect to any of them or any combination thereof, designed to provide a level of net revenues at least equal to the Fixed Rent and the Additional Rent, while at the same time providing maximum, practicable and safe transportation services at reasonable cost to the public. *Copies of the authority's plan shall be furnished to the city at the earliest possible time.*" (Emphasis added.)

Section 1.08 does not set forth specifically of what a "plan" should consist, or when it should be submitted. Further, there is nothing in the record of any description by the City of what constitutes a "plan". Nor is there any demand or request by the City that the "plan" be submitted by any specific date. There is no doubt that the City consistently since the January 20, 1970, letter, requested SEPTA to submit a plan,

but nowhere is there a description of what the City considers the "plan". SEPTA contends that its letters of March 12 and July 20, 1970, fulfill the requirements for a plan under its interpretation of the agreement.*

Whether or not SEPTA submitted such a plan by the letters and enclosures of its officials of March 12, July 6 and July 20, 1970, or whether or not it was timely given are not relevant and have no bearing on the issue of the alleged abuse of discretion of the SEPTA Board. We believe a satisfactory plan was certainly set forth in the letters and enclosures of March 12 and July 20, 1970, and that they were timely given before the public hearings commencing July 23, 1970, thereby satisfying the contractual requirements of the agreement dated September 27, 1968.

In *Blumenschein v. Pittsburgh Housing Authority*, 379 Pa. 566, 572, 109 A. 2d 331, 334 (1954) our Pennsylvania Supreme Court said: "By a host of authorities in our own and other jurisdictions, it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by the administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion, or a purely arbitrary execution of the agency's duties and functions. That the

---

*We note in passing that Section 1.22 of that same agreement gives the City the right to demand "such other reports or information" as it may reasonably request, and also the right to access to the books and records of SEPTA. There is nothing in this record which discloses that the City took advantage of these rights.

court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for the interference; judicial discretion may not be substituted for administrative discretion."

An authority cannot restrict or circumvent legislative mandates by agreements with third parties. Unless the City can point to some provision in the statute which would provide that the establishment of SEPTA's fares are subject to the conditions of the September 27, 1968, agreement, on the submission of a plan to the City, SEPTA cannot be held to have abused its statutory exclusive discretion. The City has offered no such evidence. In *White Oak Borough Authority Appeal,* 372 Pa. 424, 93 A. 2d 437 (1953), the court stated: "Neither authorities nor municipalities are sovereign; they have no original or inherent or fundamental powers of sovereignty or of legislation; they have only the power and authority granted them by enabling legislation." In *Scott v. Philadelphia Parking Authority,* 402 Pa. 151, 166 A. 2d 278, (1960) the court was asked to rule on whether an authority board could enter into a binding employment agreement to extend beyond the term of the Board. The court ruled that it could not, and stated: "If the authority has the power to contract away this right, which under sound principles of law and public policy is fundamental to a scheme of good government, it must be set forth expressly in the enabling legislation."

The Legislature has provided for public hearings as the only requirement prior to the establishment of a fare increase. The obvious purposes of a public hearing are to provide notice to all parties concerned of the nature of the fare change, to provide an opportunity to cross-examine SEPTA officials who testify, and to provide an opportunity for any interested person to offer any evidence he desires in opposition to what SEPTA proposes. The record in this case discloses that

the public hearings of July 23, 24 and 27, 1970, were properly held. Although there were questions raised at the public hearing concerning some of the financial data, there was nothing conclusive in the record to prove that SEPTA's figures were false or in significant error, and no one appealed to the court below on that basis. There were some questions raised at the public hearing on the possibility of increasing "ridership", thereby reducing SEPTA's deficit, but there was nothing conclusive offered to show that any of the suggestions made would be profitable or by how much.

The only undisputed fact is that under SEPTA's present operations it cannot meet its obligations without the fare increase proposed.

The statute which created SEPTA required SEPTA to meet its obligations, as noted above; and to that extent the lease and leaseback agreement of September 27, 1968, is pertinent and relevant. To paraphrase Section 4(d)(9) of the 1963 enabling act, SEPTA had the duty to fix its rates to comply fully with the terms and provisions of any agreement it makes with the purchasers or holders of its obligations. SEPTA has a duty to obtain sufficient revenues to meet these obligations. Since the record discloses no substantial monetary subsidies available to SEPTA, and since SEPTA has no power to levy taxes, the only sources for revenues to meet these obligations are: (1) additional ridership, (2) reducing expenses, or (3) increasing fares. SEPTA chose the latter method.

The City of Philadelphia in this case is on the horns of a dilemma, for although it is concerned, and properly so, over the possible effect of the fare increase on its citizens who use SEPTA's facilities, and the possibility that a fare increase will cause a loss in "ridership" thereby further aggravating the poor financial condition of SEPTA, the City of Philadelphia by its actions in opposing the fare increase is deterring the payment of

the rentals to the City by SEPTA, thereby affecting the City's budgetary problems. A financial healthy SEPTA will help the city budget. Yet it believes there must be other methods to reduce SEPTA's deficit to help its citizens; and therefore it opposes the fare increase. If there are any such methods, the record in this case fails to disclose them with conclusive specificity.

In summary, we concluded that with regard to the contractual obligations of SEPTA to the City to submit a plan under the provisions of Section 1.08 of the lease and leaseback agreement of September 27, 1968, under the facts and the record of this case, there is no basis to hold that there was a manifest and flagrant abuse of discretion. Accordingly, we reversed the court below by our memorandum decision filed November 25, 1970, herein.