Philadelphia *v.* Southeastern Pennsylvania Transportation Authority.

Argued February 6, 1973, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Howard D. Scher,* Assistant City Solicitor, with him *John Mattioni,* Deputy City Solicitor, and *Martin Weinberg,* City Solicitor, for appellant.

*William T. Coleman, Jr.,* with him *John F. Smith, III,* and *Lewis H. Van Dusen, Jr.,* and, of counsel, *Dilworth, Paxson, Kalish, Levy & Coleman* and *Drinker, Biddle & Reath,* for appellee.

OPINION BY JUDGE KRAMER, April 4, 1973:

This is an appeal by the City of Philadelphia (City) from an order of the Court of Common Pleas of Philadelphia County dated April 20, 1972, dismissing the City's exceptions to an order of the same court (Decree Nisi dated December 13, 1971) holding that a provision of the City's Code (Section 9-403, *infra*) providing for the licensing of buses operating in the City was inapplicable to Southeastern Pennsylvania Transportation Authority (SEPTA).

This appeal arose out of a counterclaim in an equity suit originally brought by the City against SEPTA. The original claim of the City against SEPTA involving certain alleged violations of a lease agreement pertaining to the Frankford Elevated System was tried and decided separately. That portion of the original lawsuit is not before this Court.

In the counterclaim, SEPTA alleged that because of its governmental status, as an authority, organized under the Metropolitan Transportation Authorities Act of 1963 (hereinafter referred to as MTA) (Act of August 14, 1963, P. L. 984, as amended, 66 P.S. §2001, et seq.), and because of certain provisions of agreements between the parties, the City licensing ordinance[1] is not applicable to SEPTA.

The ordinance in question was originally passed in 1915, and although it has been amended several times, the last amendment took place *prior* to the effective date of MTA and the organization of SEPTA. At the

---

[1] The City is claiming a total of $146,387.00 for license fees, plus penalties due.

risk of unduly burdening the reader, we believe it necessary to set forth the pertinent provisions of the ordinance, which read as follows:

"§9-403. Motor Buses

"(1) Prohibited Conduct. No motor bus shall be operated on the streets of the City unless the owner, lessee or bailee obtains a license for each bus from the Department of Licenses & Inspections.

"(2) License. No license shall be issued unless the applicant:

"(a) Furnishes the information required by the Department, including identification of the applicant, description of the bus, its passenger capacity and its proposed route;

"(b) Pays an annual fee of $50 for each motor bus.

"(c) Furnishes proof of compliance with the Public Utility Law of May 28, 1937, P. L. 1053, 66 P.S. §§1101 et seq., as amended, and the regulations issued under it with respect to carrying public liability insurance or filing surety bonds for the protection of the public.

"(5) Penalties. The penalty for violation of any provision of this Section or for any false statement as to any matter required to be disclosed by this Section is a fine of not less than $5, nor more than $12.50 for the first offense, not less than $7.50 nor more than $25 for the second offense, and not less than $12.50 or more than $50 for each subsequent offense, together with imprisonment not exceeding 30 days if the fine and costs are not paid within 10 days. Each day of violation shall be a separate offense.

"(6) Size. Motor buses of a total width not in excess of one hundred and two (102) inches may be operated within the City; provided that written approval of the Streets Commissioner is first obtained for any such operation on scheduled service routes and oral approval for charter routes; and provided, further, that the grant of such permission shall not be deemed to con-

stitute a waiver by the City of any other limitation or restriction which may be imposed on the operation of motor buses within the City."

The City has adopted this ordinance under its Home Rule Charter alleged to be in accord with the powers prescribed by the First Class City Home Rule Act, Act of April 21, 1949, P. L. 665, 53 P.S. §§13101, et seq. In Section 17 of the Home Rule Act (53 P.S. §13131), there is a general grant of "complete powers of legislation and administration in relation to its municipal functions," to the end that: "[T]he city may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the city by the charter it adopts or by this or any other law." The City further points to Section 1103 of The Vehicle Code, Act of April 29, 1959, P. L. 58, as amended, 75 P.S. §1103. Although this section generally denies regulatory powers to municipalities, it contains several express exceptions, among which is the grant of the power to: "[R]egulate the transportation by motor vehicles of passengers for compensation within the limits of a city, or from points in the city to points beyond the city limits, and make and enforce regulations for the operation of such vehicles not inconsistent with this act, and designate certain streets upon which such vehicles may be operated. . . ."

The City also points to Section 730 of The Vehicle Code, 75 P.S. §730, which states: "No city . . . shall require or collect any registration or license fee or tax for any motor vehicle, trailer or semi-trailer, or license from any operator thereof, except that cities may levy a fee or tax upon motor buses and motor omnibuses transporting passengers for pay or hire within the limits of any city, or from points within such city to its suburbs which are within a radius of ten (10) miles."

SEPTA counters the contention of the City by pointing out that it is a governmental instrumentality and agency of the Commonwealth with the power and responsibility to operate transit facilities in the metropolitan region embracing the counties of Philadelphia, Bucks, Chester, Delaware and Montgomery, in which area there are about 75 separate municipalities. SEPTA also points to MTA wherein its right to use any of the streets within the City, as well as its exclusive power to control its facilities (including buses) in rendering services to the public is set forth. SEPTA further points to an agreement with the City in which it is stated that SEPTA has the right to use all the streets of the City, subject to only certain *enumerated*[2] police powers of the City. SEPTA argues that under the record in this case the license fee, as described in the ordinance, is in fact a tax, but whether it is a tax or a license fee, SEPTA is not subject to same because of its governmental status.

In section 2 of MTA, 66 P.S. §2002, there is set forth the declaration of legislative public policy with regard to the establishment of a transportation authority such as SEPTA. Among other things, it says: "(a) That there exists in the urban and suburban communities in metropolitan areas, traffic congestion and serious mass transportation problems because of underdeveloped, uncoordinated obsolete mass transportation facilities . . . (b) that [are] . . . harmful to the social and economic well-being of the entire area . . . [which] (c) . . . cannot be effectively dealt with by private enterprise . . . (d) . . . and that the public acquisition of existing mass transportation facilities . . . will promote the public health, safety, convenience and welfare . . . [and that] . . . (i) . . . [t]herefore, it is hereby declared to be the

---

[2] The enumerated police powers are not relevant to the issues involved in this case.

policy of the Commonwealth of Pennsylvania to promote the safety and welfare of the inhabitants thereof by authorizing the creation of a body corporate and politic . . . which shall exist . . . for . . . [s]uch purposes [which] are hereby declared to be public uses. . . ." In Section 3(a)(8) of MTA, 66 P.S. §2003(a)(8), "buses" are specifically included to be within such a transportation system. In Section 4(a) of MTA, 66 P.S. §2004(a), the Legislature stated: "An authority shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof." In Section 4(d)(20) of MTA, 66 P.S. §2004(d)(20), we find: "A duly certified authority shall have . . . the following rights or powers: (20) To have the right to use any public road, street, way, highway, bridge or tunnel for the operation of a transportation system within the metropolitan area. . . ."

The Legislature provided certain tax exemptions applicable to such a metropolitan transportation authority in Section 39 of MTA, 66 P.S. §2039: "(a) The effectuation of the authorized purposes of any authority created under this act shall . . . be, in all respects, for the benefit of the people of the Commonwealth . . . and since such authority will be performing essential governmental functions in effectuating such purposes, it shall not be required to pay any property taxes or assessments, of any kind or nature whatsoever, now in existence or to be enacted in the future, whether imposed by the Commonwealth or by any political subdivision thereof. . . ."

Interestingly, the lower court did not decide whether the ordinance in question was a true license fee or a tax, but rather, determined that whether the ordinance provided for a license fee or a tax, SEPTA was excluded therefrom because of its governmental status as an

authority under MTA. While we agree with the lower court in both conclusions, we believe that the nature of the issues which have been presented to this Court, makes it incumbent upon us to decide preliminarily whether the ordinance does impose a true license fee or a tax.

In making this determination, it is important to note that it was stipulated that the school district of Philadelphia, which operates buses in the City, has not been requested by the City to obtain such a license or pay such a license fee. The City has made no attempt whatsoever to levy or collect any such bus license fee from the school district.

Prior case law provides the guide lines under which we are to make a distinction on whether a levy in such an ordinance is a tax or a true license fee. The common distinction is that taxes are revenue-producing measures authorized under the taxing power of government; while license fees are regulatory measures intended to cover the cost of administering a regulatory scheme authorized under the police power of government.

Our Supreme Court in the case of *National Biscuit Company v. Philadelphia*, 374 Pa. 604, 98 A. 2d 182 (1953), sheds a bright light on the distinction in question. There the Court tells us that the name given to the levy by the legislative body "is not controlling." The Court stated: "A true license fee is . . . 'A charge which is imposed by the sovereign, in the exercise of its police power, upon a person within its jurisdiction for the privilege of performing certain acts and which has for its purpose the defraying of the expense of the regulation of such acts for the benefit of the general public; it is not the equivalent of or in lieu of an excise or a property tax, which is levied by virtue of the government's taxing power solely for the purpose of raising revenues.' The distinguishing features of a license fee are (1) that it is applicable only to a type of

business or occupation which is subject to supervision and regulation by the licensing authority under its police power; (2) that such supervision and regulation are in fact conducted by the licensing authority; (3) that the payment of the fee is a condition upon which the licensee is permitted to transact his business or pursue his occupation; and (4) that the legislative purpose in exacting the charge is to reimburse the licensing authority for the expense of the supervision and regulation conducted by it. Therefore, even though the charge be labeled a 'license fee,' it cannot be regarded as such if, by being merely nominal in amount and not apparently equated to the probable cost of supervision and regulation of the licensee's activities, it presumably was not legislatively intended to provide for such cost; in such a case it must be considered as merely a registration charge intended to cover clerical costs of the issuance of the license certificate and general office expenses, and in that event it does not, of course, prevent municipal taxation under the grant of power made in the Sterling Act." 374 Pa. at 615-616, 98 A. 2d at 187-188.

Normally,[3] in this Commonwealth, anyone claiming an exemption from taxation has the burden to prove the same. In this case, it was stipulated that "the City never inspected and never did anything else" with respect to SEPTA's buses. Although there was a colloquy on the wording of this stipulation, the record discloses that the City was questioning more the period of time during which it did nothing with respect to these buses, than it was concerned with the stipulated fact of inaction. Once this stipulation was made for the record, we hold that SEPTA had met its burden of

---

[3] As is pointed out in the case of *Commonwealth v. Erie Metropolitan Transit Authority*, 444 Pa. 345, 281 A. 2d 882 (1971), cited later in this opinion, the burden on SEPTA is not the same as faces the individual taxpayer claiming an exemption.

proving a prima facie case that the license fees demanded by the City were not to be used to reimburse the City for its expense of supervision and regulation under the ordinance. At that point, the burden was on the City to come forward with proof that the license fees were being imposed for such purposes as is described in the quotation from *National Biscuit Company, supra*. The record discloses that the City offered no testimony or evidence whatsoever in this regard. This being the case, this Court, in following the beforementioned guide lines, must conclude that the ordinance in question does not represent a true license fee but rather is intended as a revenue-raising measure.

However, even if it were determined to be a license fee, we agree with the court below that the City still could not require SEPTA to obtain the license under the subject ordinance. We note first that the ordinance, having been passed in 1915, could not in any way have been intended to apply to a governmental agency, such as SEPTA, which was not contemplated in that year. Authorities, as such, were unknown at that time. In subsection (2)(c) of the ordinance, there is reference to the furnishing of proof of compliance under the Public Utility Law (Act of May 28, 1937, P. L. 1053, 66 P.S. §§1101, et seq.). Since the amendment to that law by the Act of May 2, 1945, P. L. 164, the Public Utility Commission has no jurisdiction over SEPTA except as SEPTA may provide service outside the prescribed metropolitan area. Nowhere has the City supported the appropriateness of subsection 6 of the ordinance which would permit the City's Streets Commissioner to approve service routes for the buses of SEPTA contrary to the statutes and agreements noted above. As was pointed out by the Supreme Court in *Philadelphia v. Philadelphia Transportation Company*, 345 Pa. 244, 250, 26 A. 2d 909, 912 (1942), "where a public interest is affected, an interpretation is preferred which

favors the public. . . ." Here, the legislative purpose, quoted hereinbefore, describes a public interest in excess of the territorial limits of the City, and therefore the interest of the public in the entire metropolitan region covered by SEPTA must take precedence over the restricted interests within the confines of the City of Philadelphia. We note that in *Philadelphia Transportation Company, supra,* the Supreme Court reasoned that the terms of a contract obviously related to trolley cars did not contemplate the later expansion of service by way of motor buses; and that therefore, the interpretation of the agreement in question in that case could not be expanded to include motor buses. By the same logic, the ordinance in this case should not be expanded to include the buses of a governmental authority, such as SEPTA, which could not have been contemplated by the ordinance.

In passing, we believe it necessary to comment that in *Philadelphia Transportation Company, supra,* the Supreme Court did state that the license fee then in effect in 1942 under this very same ordinance was a license fee, rather than an excise or property tax. We are not bound by that determination in that case because it is quite obvious from a reading of that decision that there was evidence in that record that the monies collected at that time under the licensee fee did reimburse the City for the expense of the regulation at that time. Furthermore, the Court cited *American Motor Coach System, Inc. v. City of Philadelphia,* 28 F. 2d 736 (3rd Cir. 1928) for the same proposition. However, the circumstances in 1928, and the state of the record in that case may have permitted those courts to determine that the license fees collected at those times were true license fees. Circumstances change, and what may have supported such a determination 30 or 40 years ago may not support such a determination in 1973. The

record in this case does not disclose such necessary facts.

We further point out that Section 1 of the ordinance prohibits SEPTA from operating its buses on the streets of the City, unless it obtains and pays for such a license. There is no way, because of MTA and the agreement[4] between SEPTA and the City, that such a provision could be upheld by this Court.

Having determined, on the basis of the record in this case, that this license fee cannot be deemed to be a true license fee, but rather is a revenue-producing measure, we next turn to the issue of whether the City could levy a tax on SEPTA'S buses. This issue is easily disposed of in view of the fact that the City has forthrightly and candidly stated to this Court that it has no such power to tax SEPTA.

As pointed out hereinbefore, MTA under the exemption section provides that SEPTA shall not be required to pay "any property taxes or assessments of any kind or nature whatsoever." SEPTA being an instrumentality of the Commonwealth[5] is not subject to taxation by a municipality in the absence of specific authority granted by the General Assembly of Pennsylvania. *See Southwest Delaware County Municipal Authority v. Aston Township,* 413 Pa. 526, 531-532, 198 A. 2d 867, 870-871 (1964), and *Robb v. Philadelphia,* 25 Pa. Superior Ct. 343, 346 (1904). In *Mastrangelo v. Buckley,* 433 Pa. 352, 250 A. 2d 447 (1969), the Court stated: "We initiate our inquiry with a restatement of a concept basic and inherent in our form of government, a concept established beyond question in the law of this Commonwealth. The power of taxation, in all forms

---

[4] The agreement provides: "The Authority shall have the right to use and occupy the City streets to the extent necessary to maintain . . . [the] equipment used in the public service."

[5] *See Philadelphia v. SEPTA,* 1 Pa. Commonwealth Ct. 101, 271 A. 2d 504 (1970).

and of whatever nature, lies solely in the General Assembly of the Commonwealth acting under the aegis of our Constitution. Absent a grant or a delegation of the power to tax from the General Assembly, no municipality, including Philadelphia, a city of the first class, has *any* power or authority to levy, assess or collect taxes. To determine whether a municipality possesses the power to tax and, if so, the extent of such power, recourse must be had to the acts of the General Assembly." (Emphasis in original.) 433 Pa. at 362-363, 250 A. 2d at 452-453. Our Superior Court in *Fischer v. Pittsburgh*, 178 Pa. Superior Ct. 16, 112 A. 2d 814 (1955), *aff'd*, 383 Pa. 138, 118 A. 2d 157 (1955) stated: "Municipal corporations can levy no taxes upon inhabitants or their property unless the power to do so is plainly and unmistakably conferred by the legislature." 178 Pa. Superior Ct. at 20, 112 A. 2d at 815-816. Furthermore, in the Supreme Court Opinion affirming the Superior Court in *Fischer, supra,* Chief Justice STERN stated: "[M]unicipal corporations can levy no taxes unless the power be plainly and unmistakably conferred by the sovereign state, and the grant of such right must be strictly construed and not extended by implication. . . ." 383 Pa. at 141, 118 A. 2d at 158. *See also Directors of the Poor of Schuylkill County v. School Directors of North Manheim Township,* 42 Pa. 21 (1862) and *Commonwealth v. Pure Oil Company,* 303 Pa. 112, 154 A. 307 (1931). Under certain circumstances our courts have ascertained that exemptions for governmental agencies are valid where there exists a "predominant public purpose," or a "governmental function," or where the Commonwealth's "rights, prerogatives or property" are in question. *See Commonwealth of Pennsylvania, State Employes' Retirement System v. Dauphin County,* 335 Pa. 177, 6 A. 2d 870 (1939); *Pittsburgh Public Parking Authority Petition,* 366 Pa. 10, 76 A. 2d 620 (1950).

In the case of *Commonwealth v. Erie Metropolitan Transit Authority*, 444 Pa. 345, 281 A. 2d 882 (1971), our Supreme Court said: "This Court has consistently held that municipal authorities are not the creatures, agents or representatives of the municipalities which organize them, but rather are 'independent agencies of the Commonwealth and part of its sovereignty.' . . . We are mindful of the general proposition that claims for exemption from taxation are to be strictly construed. . . . But this situation, where a public instrumentality is involved, another equally important rule is controlling, viz., 'that in the absence of a statute to the contrary, public property used for public purposes is exempt from taxation . . . and no express exemption law is needed.' " 444 Pa. at 348-349, 281 A. 2d at 884.

"Appellant was created to operate a mass transportation system in metropolitan Erie. It was organized under an act of the legislature which declared that authorities created under it will be 'for the benefit of the people of the Commonwealth of Pennsylvania, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions.' Moreover, authorities so organized, declared the legislature, 'will be performing essential governmental functions.' There is no contention that ETA in the case at bar is not performing such a function. It makes little sense to say that the legislature intended that a municipal corporation so engaged should be taxed on an indispensable aspect of that very function, namely, its use of liquid fuel. This is all the more true when it is realized that the legislature has recognized the need and made provisions for subsidizing mass transportation under certain circumstances." 444 Pa. at 350-351, 281 A. 2d at 885.

The City points to the case of *School District of Philadelphia v. Zoning Board of Adjustment*, 417 Pa. 277, 207 A. 2d 864 (1965), where it was held that the

School District was subject to the zoning regulations of the City pertaining to off-street parking. That case is distinguishable for the reason that the Supreme Court held that the School District was subject to the zoning regulations for off-street parking because such zoning regulation had nothing to do with the regulation of public schools. The Court quite plainly said: "In requiring off-street parking facilities, the City here is not 'Regulating public schools': it is merely trying to enforce methods of combating the congestion of its public streets. . . ." 417 Pa. at 283, 207 A. 2d at 868. By comparison, the Supreme Court later in *Pemberton Appeal*, 434 Pa. 249, 252 A. 2d 597 (1969), held that because the General Assembly had given the power to locate schools to the school districts, a zoning ordinance interfering with such power could not control the discretion of the school district to locate school buildings. All of the cases and the exemption section of MTA quoted above permit us to conclude that the City cannot tax SEPTA.

In summary then, we conclude that based upon the record made in this case, the license fee under the subject ordinance is a revenue-producing measure and not a true license fee. Having determined that, we also conclude that the City cannot levy this ordinance as a tax upon SEPTA wherefore we must affirm the court below.

---

CONCURRING OPINION BY JUDGE ROGERS:

I concur in the court's conclusion. However, the majority's extended discussion of whether the impost here in suit is a tax or a license fee carries the implication that if it had been found to be the latter it would be permissible. I recognize that the majority's opinion also declares that the City may not prohibit SEPTA from operating its buses in the City unless it obtains and pays for a license, but the emphasis on this holding is so slight and the attention given to the nature of the

City's charge here in suit so great, that I fear the opinion will provide encouragement for other efforts to exact public revenue from SEPTA's users or to regulate its activities. SEPTA is a *State agency* trying, against odds, to alleviate, for southeastern Pennsylvania, one of its most urgent problems, the inadequacy of mass transit. As the Metropolitan Transportation Authorities Act of 1963 (MTA), Act of August 14, 1963, P. L. 984, as amended, 66 P.S. §§2001, et seq., clearly states, the Legislature never intended that SEPTA, in the performance of its vital mission, should be subjected to exaction, regulation, licensure, interference or any importunity whatsoever by the political subdivisions which happen to exist within its service area; rather it was supposed that these political subdivisions would provide subsidy to SEPTA in the interest of their citizens. The City of Philadelphia has been and continues to be most generous in its financial support of SEPTA, and its efforts in this case to extract from SEPTA a substantial sum of money is as strange as it is legally futile.

In short, I would hold simply that MTA prohibits the City from making the charge in question, whatever it might be called.