**[J-56-2024] [MO: Brobson, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| THE BOROUGH OF WEST CHESTER, | : | No. 9 MAP 2023 |
| | : | |
| Appellant | : | Appeal from the Commonwealth |
| | : | Court decision dated January 4, |
| | : | 2023 at No. 260 MD 2018. |
| v. | : | |
| | : | ARGUED: September 11, 2024 |
| | : | |
| PENNSYLVANIA STATE SYSTEM OF | : | |
| HIGHER EDUCATION AND WEST | : | |
| CHESTER UNIVERSITY OF | : | |
| PENNSYLVANIA OF THE STATE SYSTEM | : | |
| OF HIGHER EDUCATION, | : | |
| | : | |
| Appellees | : | |

## CONCURRING AND DISSENTING OPINION

**JUSTICE McCAFFERY**                                      **DECIDED:  April 30, 2026**

At the macro level, this is a case about the cost of public infrastructure and how that cost is, or should be, shared.  At the granular level, it is a case about whether the Pennsylvania State System of Higher Education (PASSHE), and specifically West Chester University of Pennsylvania (collectively, University), is required to contribute to the cost of public stormwater management services in the Borough of West Chester (Borough).  Because I disagree with the Majority's determination that the Borough's "stream protection fee" (Stormwater Charge) is a tax from which the University is immune, and I conclude an issue of material fact remains unaddressed, I would reverse the order of the Commonwealth Court and remand for further proceedings.  Nevertheless, I agree with the Majority's determination that the Commonwealth Court properly allocated the

burden of proof when it ruled upon the cross-applications for summary relief. *See* Majority Opinion at 10 n.7. Thus, I concur in part and dissent in part.

Generally, a tax is a revenue producing measure authorized under the government's taxing power. It is an "enforced contribution to provide for the support of government." *United States v. La Franca*, 282 U.S. 568, 572 (1931). "The classic tax is imposed by a legislature upon many, or all citizens[. It] ... raises money, [is] contributed to a general fund, and [is] spent for the benefit of the entire community." *San Juan Cellular Telephone Company v. Public Service Commission of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992) (citations omitted). A fee, on the other hand, is a measure to cover the cost of administering a regulatory scheme or to provide a service under the government's police power. *See City of Philadelphia v. Southeastern Pennsylvania Transportation Authority*, 303 A.2d 247 (Pa. Cmwlth. 1973).

"Taxation is a legislative function, and [a legislature] … may act arbitrarily and disregard benefits bestowed by [a g]overnment on a taxpayer and go solely on ability to pay. … A fee, however, is incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station." *City of Philadelphia v. Pennsylvania PUC*, 676 A.2d 1298, 1308 (Pa. Cmwlth. 1996) (citation omitted). If a charge is not reasonably proportional to the value of the benefit received in return, it is considered a tax. However, if the charge is intended to cover the cost of providing a service, it is considered a fee — unless its purpose is primarily to raise revenue. Then, it is considered a tax. *See Rizzo v. City of Philadelphia*, 668 A.2d 236 (Pa. Cmwlth. 1995). "Fees charged by a municipality for services rendered are proper if they are reasonably proportional to the costs of the regulation or the services performed." *M&D Properties, Inc. v. Borough of Port Vue*, 893 A.2d 858, 862 (Pa. Cmwlth. 2006) (citation omitted). In *Supervisors of Manheim Township v. Workman*

(*Manheim Township*), 38 A.2d 273 (Pa. 1944), this Court held that municipal charges "based upon contract rather than taxation … must be reasonably proportional to the value of the product or service received," and further, charges "imposed without due regard to that requirement … [are], in legal effect, undoubtedly a tax," such that "the obligation to pay it could be created only by the [locality's] exercise of its general taxing power[.]" *Id.* at 276.

The challenge society encounters in constructing and maintaining any public infrastructure is determining how to raise adequate funds by the fairest means possible. To this end, government relies on taxes, fees, and assessments, among other sources of contribution — each with its own definition and terms of application. Because the lines between these terms can get blurred, and the consequences of this distortion may lead to insufficient funding, or an inequitable distribution of the associated burden, we must be exacting when discerning the proper distinctions between, and assignment of, these funding resources.

Relying upon this Court's decisions in *Jolly v. Monaca Borough*, 65 A. 809 (Pa. 1907), and *Manheim Township*, *supra*, the Majority simplifies the tax versus fee distinction into a two-part test. *See* Majority Opinion at 19. "First, the court must determine whether the municipality is performing the service in a quasiprivate or public capacity." *Id.* (*citing Jolly*, 65 A. at 810-811). Then, only if the court concludes the municipality is acting in a quasiprivate capacity, it must consider whether the charge is "reasonably proportional to the extent of use of value of the service rendered[.]"[1] *Id.* at 20 (*citing Manheim Township*, 38 A.2d at 276).

---

[1] The Majority relies heavily on the language in *Jolly* distinguishing actions taken by a municipality operating in its quasiprivate capacity from those actions taken by a municipality operating in its public capacity. Neither the Commonwealth Court, nor either of the parties, cited *Jolly* or relied upon this distinction. Rather, the argument focused on whether the Stormwater Charge was "reasonably proportional to the value or benefit (continued…)

As for the first question — whether the municipality is acting in a quasiprivate or public capacity — the Majority focuses on the "purpose underlying the municipality's participation in the service and the relationship between the municipality and the recipients of the service." Majority Opinion at 19-20 (citation omitted). At bottom, if the municipality is "acting out of duty[] for the public benefit," it is acting in its public capacity, but if it is "providing a discretionary service for private emolument[] within the scope of a contractual relationship," it is acting in a quasiprivate capacity. *Id.* at 20. (citation omitted). The Majority recognizes that this distinction may be unclear and thus provides certain factors for courts to consider. The service is quasiprivate if the municipality's participation is "discretionary or delegable" or if there is a "competitive private market." *Id.* at 21-22 (citations omitted). Conversely, the service is public if the power "confer[s] primarily or chiefly from" governmental considerations, that is, if it is "coupled with a municipal duty" which cannot be delegated. *Id.* at 22-23 (citations omitted). The Majority focuses on the "impetus behind the government's participation in the service[,]" rather than whether there is a public or private benefit. *Id.* at 23 n.18. As a final consideration,

---

received in return for its payment." *Borough of W. Chester v. Pennsylvania State Sys. of Higher Educ.*, 291 A.3d 455, 463 (Pa. Cmwlth. 2023); *see also* Borough's Brief at 23-24 (explaining that the court was required to consider (1) whether the University realized "any specific benefits" from it use of the Borough's System; (2) whether its use of the System was voluntary; and (3) whether the cost of the Stormwater Fee was proportional to the benefits the University received) (*citing Manheim Township, supra*); University's Brief at 34 (explaining the "crucial" and "dispositive" question in the "tax vs. fee inquiry" is "whether the Borough's Stormwater system provides a discrete benefit to [the University], as opposed to generally aiding the environment and the public at large") (citation omitted).

While I recognize "this Court may affirm the decision of the immediate lower court on any basis," I am troubled by the fact that the Majority appears to apply a different test in the tax versus fee debate than was requested by the parties, or, for that matter, determined by the Commonwealth Court. *Shearer v. Naftzinger*, 747 A.2d 859, 861 (Pa. 2000).

the Majority explains that a municipality engages its quasiprivate capacity when there is a contract between the municipality and the recipient of the service. *See id.* at 23-24.

Turning to the facts of this case, the Majority concludes that the Stormwater Charge is a tax for the following reasons: (1) the Borough's stormwater management service program arose from its non-delegable duty to manage stormwater runoff; (2) the service is intended to benefit the general public; and (3) there is no explicit or implied contract between the Borough and the University for this service. *See* Majority Opinion at 25-28. I conclude, however, that the Majority's approach is overly simplistic and ignores other relevant concerns.

Here, we are asked to review a system that charges property owners for stormwater management services based on the quantity of impervious surfaces on their property. It may not be a perfect system, but it makes sense — because stormwater runoff cannot be readily absorbed by impervious surfaces, those surfaces are more likely to convey contaminants and unwanted waste into our waterways. Thus, impervious surfaces seem a reasonable indicator of the burden a property's stormwater runoff places on a community's stormwater management system — especially where a more precise method of measure is not identified.

It is beyond peradventure that the University derives a valuable benefit by being able to discharge a certain quantity of its stormwater runoff into the Borough's Stormwater Management System. This benefit inures to the University in the form of cost savings and the ability to use its property for purposes other than stormwater management. This is true for other landowners in the Borough as well, but the extent of the value to each landowner varies by factors such as the size of the respective property and the extent of the impervious surface on it. Although I acknowledge that perceived "fairness," alone, cannot be the driving factor in this Court's decision — especially where the General

Assembly has spoken on the tax immunity of Commonwealth-owned properties — I cannot escape noting fairness would otherwise suggest that the University, as a user of the Borough's Stormwater Management System, should contribute to the System's operation and maintenance.

Like the Majority, I recognize that the "Borough's stormwater management service is prompted, at least in part, by the federal and state mandates imposed on the Borough itself." Majority Opinion at 26 (footnote omitted). Nevertheless, these same mandates make clear that no landowner may simply disregard stormwater flowing from one's own property onto another's. A landowner may not alter the natural flow of surface water by concentrating it by artificial means and then discharging it onto lower lands.[2] Further, the University, like any landowner, has a duty to comply with the requirements of the Pennsylvania Stormwater Management Act, which mandates that "[a]ny landowner … engaged in the alteration or development of land which may affect storm water runoff characteristics shall implement such measures consistent with the provisions of the applicable watershed storm water plan as are reasonably necessary to prevent injury to health, safety or other property." 32 P.S. § 680.13. The University has elected to develop

---

[2] As this Court stated in *Lucas v. Ford*, 69 A.2d 114 (Pa. 1949):

> The owner of upper land has the right to have surface waters flowing on or over his land discharged through a natural water course onto the land of another, but he may not cut an artificial channel to divert that water[.] … He may make proper and profitable use of his land even though such use may result in some change in quality or quantity of the water flowing to the lower land[.] … If that change is not unreasonable in relation to the use, any loss resulting to the owner of the lower land is *damnum absque injuria*[.] … In that connection, the upper owner may lay artificial drains in his land provided they do not divert the water from its natural course or cause unnecessary injury to the lower owner[.]

*Id.* at 116 (citations omitted).

certain portions of its property including the installation of impervious surfaces that contribute, and in some cases exacerbate, stormwater runoff. Because of these decisions, the University is required to take efforts to mitigate against any increased stormwater runoff and attendant drainage that may result therefrom. These efforts could include the design, installation, operation, and maintenance of its own system. By using the Borough's system, the University gains a discrete benefit in that it does not have to build its own stormwater management system that fully complies with the Pennsylvania Stormwater Management Act. The Stormwater Charge, here, **serves the purpose** of **remedying** "the environmental harms associated with stormwater runoff and [holding] stormwater dischargers responsible for footing the bill[,]" as well as "**incentivizing** property owners to reduce the amount of impervious surface on their land and [**engaging**] in stormwater management practices that qualify them for credits." *Norfolk Southern Railway Co. v. City of Roanoke*, 916 F.3d 315, 322 (4th Cir. 2019) (emphases added).

Accordingly, while the Borough is acting out of a duty to protect the public from stormwater runoff, the University also receives a discrete benefit from the Stormwater Management System. Indeed, the University's Associate Vice President of Facilities, Gary Bixby, confirmed during his October 2020 deposition that the University's own MS4 permit was "at least in part, predicated upon the ability to discharge storm water though the Borough-owned system[.]" Deposition of Gary Bixby, 10/13/2020, at 223 (R.R. at 816a). Without use of the Borough's system, the University would be unable to manage its stormwater runoff on its own. While the Majority mentions the purported benefit of the service to the recipient (or, as it finds here the lack thereof) as a relevant factor, it hyper-focuses on the underlying purpose of the Ordinance and ignores this critical benefit the University receives. The Majority also fails to consider the corresponding impact of its decision which will require the Borough taxpayers to foot the bill for the University's use

of the Borough's system, thereby escaping responsibility for the legislatively required remediation of stormwater runoff.

The Majority finds additional support for its conclusion that the Borough is acting in its public capacity by the "apparent lack of a contractual relationship between the Borough and the landowners subject to the Stormwater Charge." Majority Opinion at 27. It cites the following factors: (1) stormwater management services are not the type of service property owners generally seek out; (2) those properties that "lead to the greatest proliferation of runoff are not the same properties that will suffer the greatest consequences[;]" (3) the landowners do not take any affirmative action to use the stormwater system; and (4) the Ordinance imposes the Stormwater Charge on developed properties even if they are only "indirectly benefitted by the Borough System[.]" *Id.* at 28-29, 31. However, I view it differently.

As explained above, landowners are required to manage their stormwater runoff. Moreover, they may be civilly liable for injuries caused by a violation of the Storm Water Management Act. *See* 32 P.S. § 680.15(c). Thus, whether landowners would generally seek out this type of service, whether their property is the least affected by stormwater runoff, or whether they expressly agree to utilize the Borough's system, all landowners directly benefit from the Borough's stormwater system — either by protection from runoff damage or protection from liability for runoff production. I recognize the Majority emphasizes the language in the Borough's Ordinance that states the Charge will be imposed on every developed property in the Borough, even if it is "indirectly benefitted" by the System. Majority Opinion at 30 (citation omitted). While the Majority focuses on a purported "indirect" benefit, it fails to acknowledge that the Charge is imposed only on developed properties **within the Borough**. As explained above, if a property sits within the Borough, the Stormwater Management System benefits it either by protection from

runoff damage or protection from liability for runoff production. In my view, the "indirect benefit" language is simply surplusage.

Although the Majority recognizes that there is an appeal system in place for the University to dispute the Stormwater Charge and to receive credits against it, it brushes aside the availability of this option, concluding, instead, the University has no choice but to utilize the Borough's Stormwater Management System and the existence of a credit appeal system after the Stormwater Charge is imposed does not establish the University's "assent" to the Charge in the first instance. *See* Majority Opinion at 29 nn.25-26.

Again, I disagree. The existence of an appeal system that the University has not utilized, and the acknowledgement the University could construct a comprehensive stormwater management system of its own, but has chosen not to do so, are powerful indicia that the University has freely accepted the *status quo*. It does not take evidence of an arm's length contractual process to establish the Stormwater Charge is paid by choice.[3] Thus, in my opinion, the Commonwealth Court erred when it held that the Charge is a tax and granted the University summary relief.

Because the Majority concludes the Borough imposes the Stormwater Charge in its public capacity, it ends its discussion here. However, under my analysis, we must also determine whether the Stormwater Charge is proportional to the value, *i.e.*, the benefit, the University receives from its use of the Borough's Stormwater Management System.

The Borough asserts the proper measure of the System's benefit to the University is the amount the University would be required to pay if it chose to forego its reliance on

---

[3] The Borough notes that it is not aware of any need for an actual contract between itself and the University to provide stormwater management services, and neither am I. Borough's Brief at 42 n.13; *see also Manheim Township*, 38 A.2d at 276 ("Charges made in connection with [municipal] operations are based upon contract rather than taxation because those who consume the product or receive the service act in so doing voluntarily, either as individuals or as a neighborhood [] and thereby impliedly agree to pay the price of the product furnished or service rendered.").

the Borough's System. *See* Borough's Brief at 49. The Borough's expert estimated the University would be required to spend $178,500, per year, to build and maintain a system that could properly manage the entirety of its stormwater from North Campus. *See id.* The Borough contends that by relying on the public Stormwater Management System, the University saves money, and thus receives substantial value, because the University's annual costs (*i.e.*, the amount of the Stormwater Charge) are considerably less — at $132,088.68, per year.[4] *See id.* Further, to the extent the Commonwealth Court rejected impervious cover as the proper measurement for determining the Stormwater Charge, the Borough argues the relationship between impervious surface and stormwater runoff is "axiomatic and well-recognized," and that it "is unaware of any measure for calculating a stormwater management fee which does not at least include the amount of impervious cover at a property." *Id.* at 52-53.

In response, the University asserts that even if the Stormwater Charge might be a fee for service, it cannot be imposed on the University because it is not reasonably proportional to the benefit it receives. *See* University's Brief at 43. The University argues (1) the Stormwater Charge funds are used to support projects other than pipe maintenance, (2) the Borough has used General Fund tax revenues to construct and maintain the Stormwater Management System — meaning those costs are otherwise accounted for, and (3) the Borough did no analysis of the actual expected cost of maintaining the portion of the Stormwater Management System associated with the University's property. *See id.* at 44-45. Thus, billing the University roughly $132,000, per year, "for no specific current or ongoing services, is inherently unreasonable." *Id*. at 45.

---

[4] This evidence is specifically related to the University and **not** the general public. Even if we were to assume that the actual number is less (or accepting the University's own estimate of $132,000) — is it not the agreed-upon fact that the University's use of the Borough's system results in a $132,000 saving per year enough to show a discernable, discrete, and direct benefit to the University?

Persuaded by the United States Court of Federal Claims' decision in *DeKalb County, Georgia v. United States*, 108 Fed. Cl. 681 (2013), the Commonwealth Court rejected the idea that benefits from a stormwater management system may be determined based on the impervious surface cover on a property. However, the symbiotic relationship between impervious surfaces and stormwater runoff is not a novel concept. The Environmental Protection Agency recognizes: "Stormwater runoff is a major contributor to water pollution. When rainwater washes over impervious surfaces such as rooftops, parking lots, and roads, it collects and carries pollutants that ultimately flow into waterways." https://www.epa.gov/smartgrowth/impervious-surface-growth-model (last accessed 2/26/2026).

Moreover, as the Borough points out, the relationship between impervious cover and stormwater runoff, as a means for assessing stormwater charges, has been accepted in other jurisdictions. *See Norfolk Southern Railway Company v. City of Roanoke*, 2017 WL 6599008, *10-*11 (W.D. Va., Dec. 26, 2017) (concluding that impervious surface area is a reasonable basis for the amount of a stormwater fee, particularly where a property owner can appeal the charge); *see also McLeod v. Columbia County*, 599 S.E. 2d 152, 156 (Ga. 2004) (holding that a stormwater charge based on the amount of impervious surface area bore a "reasonable relationship to the benefits received by the individual developed properties in the treatment and control of … stormwater runoff[]"). Further, though in the context of sewer charges, our Commonwealth Court has held that "there is value in simply being connected to a sewer system." *GSP Management Company v. Duncansville Municipal Authority*, 126 A.3d 369, 373 (Pa. Cmwlth. 2015) (*citing Washington Realty Company v. Municipality of Bethel Park*, 937 A.2d 1146, 1150 (Pa. Cmwlth. 2007)). "[R]ates need not be proportioned with exactness to [the] use made or the cost to the individual customer, so long as it is reasonably related to the cost of

maintaining the service for all customers, and the customers challenging the rates received 'some' benefit from the system."  *Id*. at 374 (*citing Ack v. Carrol Township Authority*, 661 A.2d 514, 518 (Pa. Cmwlth. 1995)).

In regard to proportionality, I reiterate that impervious surface, while not a perfect indicator, seems a reasonable basis for determining the amount of stormwater management benefit provided to a developed property.  Further, evidence here suggests that the annualized cost to the University to address the entirety of its stormwater runoff could, in fact, exceed the amount it is charged each year by the Borough.  And, while the University contends that much of the Stormwater Charge is utilized for activities that provide it no direct benefit, I note that those activities — *i.e.*, among other things, tree planting and street sweeping — are integral to the effective operation of a stormwater management system and, thus, provide benefit to the entire community, even if that benefit is less obvious than pipe repair and maintenance.

The implementation of means and methods, as part of an overall strategy to protect and preserve environmental concerns, benefits the entire community, while assessing the cost burdens of doing so on a *pro rata* basis.  Since this strategy is critical to the maintenance of the Borough's infrastructure, programs and projects that are **reasonably related** to stormwater management should be considered when evaluating the proportionality of the charge for such services.  Moreover, because the University utilizes part of the Borough's Stormwater Management System, and the Borough is the entity that is ultimately tasked with compliance as to the state and federal laws regarding stormwater management, the Borough's efforts implemented to reduce stormwater runoff **should be considered in the final analysis** of the Charge's proportionality to the benefit received.

At bottom, there is no denying the University benefits from the Borough's Stormwater Management System.  However, the value of those benefits must be carefully

weighed vis-à-vis the Stormwater Charge. The amount of impervious surface on North Campus informs that view, but a more detailed review is required to determine, precisely, whether the Charge accurately reflects the benefit the University receives — especially where the University currently maintains its own, separate stormwater management system. Because it determined the Charge is a tax, rather than a fee, the Commonwealth Court did not engage in the requisite analysis to reach an informed conclusion on this point. Accordingly, I would remand to the Commonwealth Court to conduct the necessary review of proportionality.

Moreover, *amicus*, Pennsylvania Municipal Authorities Association, *et al*. (collectively, PMAA), notes that public policy favors recognition of the Stormwater Charge as a fee that a Commonwealth entity, such as the University, should be required to pay in exchange for the benefits of stormwater management it receives in return. Focusing on our capital city, PMAA writes

> [t]here is nothing equitable about dissociating financial responsibility from discouraged conduct. It leads to situations like Harrisburg, where the Commonwealth government is free to construct impervious surface behemoths — like the sprawling Capital Complex … [a]ll the while the taxpaying citizens of Harrisburg, many of whom qualify as low-income, foot the increasing bills for [] service[.]

PMAA Brief at 30. Again, while "fairness" alone cannot be — and is not — the basis for our disagreement with the Majority, the Harrisburg example illustrates the importance of drawing the proper distinction between a fee and a tax — before summarily dismissing the Commonwealth from sharing the cost of critical infrastructure, from which it receives a tangible benefit.

To conclude, stormwater management is vitally important and requires a concerted effort to implement an effective stormwater management plan and system. Accordingly, many political subdivisions have implemented policies providing that those who own

properties that significantly contribute to stormwater runoff must share in the costs of stormwater mitigation and abatement. These policies find support in our State Constitution. Article 1, Section 27, of our Charter provides:

> § 27. Natural resources and the public estate.
>
> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27. These are not just lofty words, aspirations, or goals; they are an expression of our rights as Pennsylvanians. Stormwater management is critical infrastructure — the same as roads, schools, and public utilities — and is vital for protecting the environment. As such, our elected officials, in enacting these programs, are attempting to provide sufficient funding for well-designed and well-constructed stormwater management systems across the Commonwealth.

Therefore, to the extent I agree with the Majority's conclusion that the Commonwealth Court properly allocated the respective burdens of proof in its analysis of the parties' cross-applications for summary relief, I concur. However, I dissent from the Majority's determination that the Stormwater Charge is a tax, as I conclude the University voluntarily utilizes the Borough's Stormwater Management System and receives a discrete benefit, or benefits, in exchange for that use. Accordingly, I would reverse the Commonwealth Court's order and remand for the Court to consider whether the amount of the Stormwater Charge billed to the University is proportional to the benefit(s) it receives from the Borough's Stormwater Management System.

Justice Donohue joins this concurring and dissenting opinion.