A Condemnation Proceeding in Rem by Redevelopment Authority of the City of Philadelphia. For the Purpose of Redevelopment of Franklin Town Project, Philadelphia, Including Certain Land, Improvements and Properties. Philip B. Basser et al., Appellants.

Thomas Lazar, Appellant, v. Redevelopment Authority of the City of Philadelphia, Appellee.

Thomas Lazar, Appellant, *v.* Redevelopment Authority of the City of Philadelphia, Appellee.

Thomas Lazar, Appellant, *v.* Redevelopment Authority of the City of Philadelphia, Appellee.

Philip Basser, Appellant, *v.* Redevelopment Authority of the City of Philadelphia, Appellee.

Argued March 4, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*David Freeman,* for appellants.

*Michael Churchill,* with him *Peter A. Galante,* General Counsel, *William T. Steerman,* Special Counsel, and *Nicholas J. Scafidi,* for appellee.

OPINION BY JUDGE CRUMLISH, JR., May 27, 1975:

Consolidated for disposition in the instant case are appeals by Thomas Lazar and Philip B. Basser (Appellants) from an order of the Court of Common Pleas of Philadelphia County dismissing preliminary objections to a declaration of taking filed by the Redevelopment Authority of the City of Philadelphia (Redevelopment Authority). We affirm that order.

On April 26, 1973, the Redevelopment Authority filed a declaration of taking of an area comprising approximately fifty acres within the City of Philadelphia bounded on the east by Sixteenth Street, on the west by 21st Street, on the south by Race Street and on the north by Spring Garden Street. Preliminary objections

were filed by a number of property owners in the area. Settlements reduced the number to seven and they are before us in the action in its present posture. After weeks of extensive hearings, the Court of Common Pleas, in an exhaustive and ably articulated opinion by Judge TAKIFF, dismissed the preliminary objections.

The area involved in this taking is a combination of residential, industrial, institutional, light industry and commercial uses. Previously (January 1952), it had been certified as a Redevelopment Area by the City Planning Commission and had then been recertified in 1967 when the comprehensive plan of the Planning Commission renewed its call for redevelopment of the area.

The results of the various studies were introduced into evidence which demonstrated that over the years the area had excessive land coverage by buildings, and that it lacked proper light, air and open space in addition to its having faulty street and lot layouts, traffic and circulation deficiencies, excessive dwelling density and miscellaneous environmental deficiencies. In each certification by the City Planning Commission and in the various summary reports compiled by the comprehensive planning division of the Planning Commission based on criteria of the Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, *as amended,* 35 P.S. §1701 et seq., the area was certified as "blighted." Appellants concede that the area is "blighted" for purposes of this appeal.

The area, publicly identified as "Franklin Town," was considered for development by a joint venture consisting of Philadelphia Electric Company, Smith Kline Corporation, ITE Imperial, The Korman Corporation and Butcher & Sherred, and was envisioned by them as a complete non-subsidized or non-assisted project, so that the total cost of the project would be borne by the Redeveloper alone, rather than a project which required public money subsidies. In 1969, following con-

sultation with the Redevelopment Authority, the Planning Commission and the Mayor, the feasibility of the project as a non-assisted project was determined limiting public aid to the employment of the authority of Eminent Domain.

By Resolution No. 7522 of the Redevelopment Authority, Franklin Town (then a joint venture) was conditionally approved as redeveloper for the project and an assistance agreement was executed between the joint venture and the Redevelopment Authority on June 16, 1971, whereby the Redevelopment Authority would render professional and technical service required for the preparation of a redevelopment proposal, preparation of ordinances, acquisition of properties, management of acquired properties and other services with all of the direct and indirect costs for the same to be paid by the Redeveloper. Following public meetings, the Redevelopment Authority, on September 3, 1971, by its formal Resolution No. 7635 reaffirmed its selection of Franklin Town as developer after considering the developers' financial ability to acquire the area. It approved the redevelopment proposal and authorized preparation of an ordinance to implement the execution of the project. The public hearings before the Council of the City of Philadelphia held on December 8, 1971, and deliberations thereon resulted in the passage of Council Bill No. 2666 which was approved on December 31, 1971, by the Mayor and authorization was then given to the Redevelopment Authority "to proceed with minor changes in substantial conformity with the said Redevelopment Proposal."[1] That

---

1. Section 1 of Bill No. 2666 states in relevant part: "The Council of the City of Philadelphia hereby ordains: Section 1. The redevelopment proposal dated July, 1971, including the detailed redevelopment area plan, as superseded and amended, the maps, and all other documents, plans, and supporting data which form part of the proposal, submitted by the Redevelopment Authority for the Center City Redevelopment Area, Franklin Town

ordinance further empowered the Redevelopment Authority to execute a redevelopment contract with the joint venturers who were later to organize as a corporation, Franklin Town, and "to take such action in substantial conformity to the redevelopment contract as may be necessary to carry it out."[2]

On December 15, 1972, a redevelopment contract was executed between Franklin Town Corporation and the Redevelopment Authority providing for acquisitions of approximately 10 acres of property by the Authority and to stage transfers thereof to Franklin Town Corporation within 84 months.

The preliminary objections filed and dismissed below consisted of the following:

---

Project, (hereinafter called 'Project'), having been duly reviewed and considered, is approved. *The Redevelopment Authority is authorized to take such action as may be necessary to carry it out. City Council authorizes the Redevelopment Authority to proceed with minor changes in substantial conformity with the said redevelopment proposal as long as said minor changes are in conformity with the current area redevelopment plan for the Project.* The Project is bounded as follows:" (Emphasis added.)

2. Section 5 of Bill No. 2666 states: "SECTION 5. The Redevelopment Authority is authorized to execute the hereby approved redevelopment contract with Franklin Town, a joint venture, to be reorganized as a corporation, (hereinafter called 'Redeveloper'). *The Redevelopment Authority and the Redeveloper are authorized to take such action in substantial conformity to the redevelopment contract as may be necessary to carry it out.* Council finds and determines with respect to relocation in particular, that the hereby approved redevelopment contract provides, and the Redeveloper agrees, that the Franklin Town Relocation Standards and Guarantees contained in the said redevelopment contract include, but are not limited to, the standards and philosophy of the Federal Uniform Relocation Act of 1971, or as the Act may hereafter be amended. Council further finds and determines that the hereby approved redevelopment contract provides that the Redeveloper will exceed the said federal relocation standards as they may be administratively interpreted in specific instances provided for in the documentation contained in the said redevelopment contract." (Emphasis added.)

1) It was advanced that no blight existed.

2) The Redevelopment Authority acted in an arbitrary and capricious manner.

3) The taking was discriminatory and for a private purpose.

4) Improper bond was posted.

As previously noted, Appellants now concede the blight issue but argue the lower court's error as to the outstanding three questions. We can find no such error.

## ARBITRARY AND CAPRICIOUS CONDUCT

Appellants argue that the mandate of *Schwartz v. Urban Redevelopment Authority*, 411 Pa. 530, 192 A. 2d 371 (1963) and *City of Philadelphia v. Southeastern Pennsylvania Transportation Authority*, 1 Pa. Commonwealth Ct. 101, 271 A. 2d 504 (1971) has been ignored. Those cases said, "[t]he authority is a public body exercising public powers of the Commonwealth as an agency thereof . . . as a public body it stands in a fiduciary relationship to the public and the taxpayers, and its conduct must always be guided by the rule of good faith, fidelity and integrity." *City of Philadelphia v. Southeastern Pennsylvania Transportation Authority, supra*, 1 Pa. Commonwealth Ct. at 110, 271 A.2d at 508.

The first of Appellants' contention is that the Redevelopment Authority acted in bad faith by executing an assistance agreement with Franklin Town. We find this without merit. This and other redevelopment authorities have used similar agreements and nowhere in law can we find the suggestion of impropriety in its use. Second, Appellant contends that the exclusion of the Lit Brothers warehouse was in some way discriminatory. Section 1702.(c.1) of the Urban Redevelopment Law, 35 P.S. §1702.(c.1), in announcing the declaration of policy of the Act, provides for either total acquisition, clearance and disposition of blighted areas *or* acquisition clearance and disposition of a *portion thereof* to eliminate the

blight.[3] Operating within such a mandate, the Redevelopment Authority could well have chosen to allow one or more warehouses or other properties to remain in the area notwithstanding Appellants' decisional disagreement. The Authority's conduct was neither capricious nor arbitrary.

## TAKING FOR PRIVATE PURPOSE

It is hornbook in Pennsylvania law that an authority may not condemn lands for private purposes. *Kramer Appeal,* 438 Pa. 498, 266 A. 2d 96 (1970) ; *Price v. Philadelphia Parking Authority,* 422 Pa. 317, 221 A. 2d 138 (1966) ; *Belovsky v. Redevelopment Authority of Philadelphia,* 357 Pa. 329, 54 A. 2d 277 (1954) ; *Golden Dawn Shops, Inc. v. Philadelphia Redevelopment Authority,* 3 Pa. Commonwealth Ct. 314, 282 A. 2d 395 (1971).

In *Golden Dawn, supra,* we held that a preliminary objection raises an issue of fact from the determination of which a legal conclusion as to the Authority's power to purchase follows. In that case no evidentiary hearing as to purpose was held, and so a remand for an evidentiary hearing was necessary. In the case before us, Judge TAKIFF presided over exhaustive hearings and purpose of the taking was one of the prime issues. We now have

---

3. Section 1702.(c.1) states:

"It is hereby determined and declared as a matter of legislative finding.—

. . . .

"(c.1) That certain blighted areas, or portions thereof, may require total acquisition, clearance and disposition, subject to continuing controls as provided in this act, since the prevailing condition of decay may make impracticable the reclamation of the area by rehabilitation or conservation, and that other blighted areas, or portion thereof, through the means provided in this act, may be susceptible to rehabilitation or conservation or a combination of clearance and disposition and rehabilitation or conservation in such manner that the conditions and evils hereinbefore enumerated may be eliminated or remedied."

before us a complete record. *See Faranda Appeal*, 420 Pa. 295, 216 A. 2d 769 (1966).

Appellants contend, however, that the lower court's conclusion of law number 8 on the purpose of the taking is an inaccurate statement and conclusion of the law. That conclusion states:

> "*The present condemnation serves a public purpose of removing blight* from the Franklin Town portion of the Center City Redevelopment Area." (Emphasis added.)

Citing *Golden Dawn, supra*, Appellants argue that if the area is certified as blighted, the consequential taking is *not*, of necessity, for a public purpose. Appellee counters by asserting that *Belovsky v. Redevelopment Authority of Philadelphia, supra*, is controlling on this issue, and neither *Price v. Philadelphia Parking Authority, supra*, nor *Golden Dawn, supra*, cited by Appellants, have changed the law of taking for a public purpose. We must agree with Appellee, and also reject Appellants' argument that although the individual actions taken to secure condemnation rights, proper zoning, etc. were not illegal and for a private purpose, the entirety of the plan when viewed in perspective shows taking for a private purpose.

Justice STERN, speaking *for* the Court in Belovsky, *supra*, after comparing the purposes of the Housing Authorities Law and the Urban Redevelopment Law, wrote:

> "In the case of the Urban Redevelopment Law, therefore, the justification of the grant of the power of eminent domain is even clearer than in the case of the Housing Authorities Law, *there being in the present act [the Urban Redevelopment Law] only the one major purpose of the elimination and rehabilitation of the blighted sections of our municipalities, and that purpose certainly falls within any conception of 'public use'* for nothing can be more beneficial to the community as a whole than the clearance and reconstruction of those sub-standard areas which are

characterized by the evils described in the Urban Redevelopment Law.

. . . .

Nothing, of course, is better settled than that property cannot be taken by government without the owner's consent for the mere purpose of devoting it to the private use of another, even though there be involved in the transaction an incidental benefit to the public. *But plaintiff misconceives the nature and extent of the public purpose which is the object of this legislation. That purpose, as before pointed out, is not one requiring a continuing ownership of the property as it is in the case of the Housing Authorities Law in order to carry out the full purpose of that act, but is directed solely to the clearance, reconstruction and rehabilitation of the blighted area, and after that is accomplished the public purpose is completely realized.* When, therefore, the need for public ownership has terminated, it is proper that the land be re-transferred to private ownership, subject only to such restrictions and controls as are necessary to effectuate the purposes of the act. It is not the object of the statute to transfer property from one individual to another; such transfers, so far as they may actually occur, are purely incidental to the accomplishment of the real or fundamental purpose.

. . . .

"Indeed, so far from it being legally objectionable that property acquired by eminent domain be resold or retransferred to private individuals after the purpose of the taking is accomplished, the law actually requires that property be taken by eminent domain only to the extent reasonably required for the purpose for which the power is exercised (Bachner v. Pittsburgh, 339 Pa. 535, 539, 15 A.2d 363, 365) and upon cessation of the public use the public ownership is properly discontinued. *Nor does the taking lose its*

*public character merely because there may exist in the operation some feature of private gain, for if the public good is enhanced it is immaterial that a private interest also may be benefited."*
*Belovsky v. Redevelopment Authority of Philadelphia, supra,* 357 Pa. at 338-41, 54 A. 2d at 282-83 (Emphasis added.)

Appellees, having conceded for purposes of this appeal, that the area in question has properly been certified as blighted, cannot prevail in their argument, for as Justice STERN held, "there [is] in the present act [Urban Redevelopment Law] only the one major purpose of elimination and rehabilitation of blighted sections of our communities, and that purpose certainly falls within any conception of 'public use.' " The short of this is that *Belovsky, supra,* is dispositive and incidental private gain does not vitiate the public character of the taking of blighted areas.

ORDINANCE DIRECTIVE OF CORPORATE SURETY

We come now to the final issue to be determined. Appellants urge us to find that the taking is illegal because the Redevelopment Authority failed to comply with the City ordinance requiring *corporate surety* in double the amount of the estimated acquisition costs. Appellees retort by arguing that the surety is not objectionable since it is in *substantial conformity to the contract* as specifically provided for by Council Bill No. 2066. We now refer to the relevant statutory and contract provisions dealing with surety. The Assistance Agreement between Franklin Town and the Redevelopment Authority containing cost, bond and damage provisions states:

"b. *Direct Costs*

"Payment for all direct costs shall be made to the Authority by the Redeveloper upon receipt from the Authority of a requisition for actual costs incurred by the Authority.

"Prior to execution of the Redevelopment Contract for the project, the Redeveloper agrees to furnish the Authority with a letter from an insurance company or bank acceptable to the Authority, verifying that the Redeveloper has a *letter of credit or other acceptable form, in an amount agreed upon by the Redeveloper and the Authority as sufficient to cover all elements of damage in the Pennsylvania Eminent Domain Code to be incurred by the Authority in the execution of this project,* and the insurance company or bank will, upon request, pay to the Redeveloper for transmittal to the Authority the funds requisitioned by the Authority from time to time for payment of costs incurred hereunder. (Emphasis added.)

"6. *CONDEMNATION BOND*

"To secure the obligation of the Redeveloper to pay costs incurred under this Agreement pursuant to the Pennsylvania Eminent Domain Code, the Redeveloper agrees to deposit with the Authority, prior to the Authority's execution of the Redevelopment Contract, a bond or bonds with *corporate surety,* in form reasonably satisfactory to the Authority suitable for filing with the Court with a Declaration of Taking in an amount agreed upon by the Redeveloper and the Authority. The amount of the bond to be sufficient to cover and based upon the following elements of damage in the Pennsylvania Eminent Domain Code: *twice the estimated acquisition costs of property to be acquired by the Authority* including the estimated amount of machinery and equipment damages for such properties, plus the total estimated costs for commercial and residential relocation payments and damages for loss of patronage." (Emphasis added.)

The Eminent Domain Code, Act of June 22, 1964, Special Sess., P.L. 84, *as amended,* 26 P.S. §1-403 provides:

"(a) Bond. Except as hereinafter provided, every condemnor shall give security to effect the condemna-

284

tion by filing with the declaration of taking its bond, without surety, to the Commonwealth of Pennsylvania for the use of the owner or owners of the property interests condemned, the condition of which shall be that the condemnor shall pay such damages as shall be determined by law."

Section 1-403 is explained in the 1964 Comment by the Joint State Government Commission as follows:

"This subsection changes existing law. Generally, under existing law when a condemnor is required to give security, the condemnor must tender a bond to the owner and if the bond is not accepted by the owner, the condemnor must file it in court and have it approved. See e.g., The First Class Township Code, 1931 June 24, P.L. 1206, Art. XIX, §1903, as re-enacted and amended (53 P.S. §56903) and as to corporations, the Act of 1874, April 29, P.L. 73, §41, as amended (15 P.S. §482). It is intended by this subsection to eliminate the necessity of tendering a bond to the condemnee and obtaining court approval thereof; the condemnor merely files an open end bond with the declaration of taking. If the condemnee desires to challenge the bond, he may file preliminary objections thereto after being served with notice. See Sections 405 and 406. It is intended by this subsection that the bond filed shall be an open end bond."

A careful review of the material statutory and contractual provisions makes it abundantly clear that although the contractual corporate surety provisions call for surety to be twice the estimated acquisition cost of property to be acquired, it is not specifically required by the Eminent Domain Code. Albeit comporting to the open end provision, the condemnor and the redeveloper have elected to agree to such an arrangement. The nautral question which must follow is what of the rights of the sundry condemnees? Do not they have some right to challenge the sufficiency of the security arrangement between

the condemnor and the redeveloper so that they may be assured that there are sufficient funds to satisfy condemnation damages? Of course they do. Section 406(a) and (c) of the Eminent Domain Code, 26 P.S. §§1-406(a) and (c) provide the method by which the condemnee, by preliminary objection, may challenge the sufficiency of the bond. That procedure was followed in the present case.

At this point, it might be well to point out that the Assistance Agreement between Franklin Town and the Redevelopment Authority contained an apparent redundancy when it provided for security to cover all elements of damage payable under the Eminent Domain Code, first in the form of a letter of credit from a bank or insurance company, and then second, in the form of a bond with corporate surety in a form reasonably satisfactory to the Authority. In the final agreement of December 15, 1972, between Franklin Town and the Redevelopment Authority, only that provision dealing with corporate surety was included. It was this final contract which was submitted to, and approved by City Council wherein all parties were authorized to proceed in *substantial conformity to the Redevelopment contract as may be necessary to carry it out.*

And now, we reach the determinative issue of sufficiency of the security. The actual security for damages incurred by reason of condemnation given by Franklin Town to the Authority is as follows: 1) Franklin Town Corporation's unconditional bond in the amount of $20,000,000; 2) a second mortgage on all presently owned and after acquired property of the Franklin Town corporation; 3) a letter of commitment from Girard Bank. We must decide whether this security, which admittedly is not corporate surety as was literally written by contract and ordinance, is a legally satisfactory substitute for corporate surety in light of the meaning of the substantial conformity provision of the Council ordinance and

the purpose underlying the contractual provision of corporate surety to provide a sufficient fund for condemnation damages, we hold that the substituted security is valid.

Judge TAKIFF below accurately observed that the objection of condemnees pursuant to Sections 406(a) and (c) must, of necessity, go to *sufficiency* and not to *form*.[4] The incisive inquiry must, therefore, go to an examination of the security posted to determine whether it will be sufficient to meet condemnation damages, and not to de-determine whether the form of that security is in substantial conformity to the contractual corporate surety provision.

The unconditional bond posted by Franklin Town was in the amount of $20,000,000.00. In non-assisted redevelopment programs, the Redevelopment Authority requires that the bond be twice the appraised value of the real estate, machinery and equipment, and 100% of relocation costs and loss of patronage damages. For the present project the formula amounts to $18,000,000.00. The posting of a $20,000,000.00 unconditional bond doubtless is sufficient.

In addition, Girard Bank's letter of commitment for the sum of $12,100,000.00 to cover all damages arising under the Emininet Domain Code, must be classed as sufficient as practicality dictates that such a letter is highly liquid and provides easy access to the funds committed by the letter. Franklin Town has agreed with

---

4. Specifically, Section 406(a)(2), 26 P.S. §1-406(a)(2) states:

"(a)    Within thirty days after being served with notice of condemnation, the condemnee may file preliminary objections to the declaration of taking . . . Preliminary objections shall be limited to and shall be the exclusive method of challenging . . .

"(a)    the *sufficiency* of the security; . . . ." (Emphasis added.)

Girard Bank that these funds are to be used solely for acquisition and relocation costs and that all withdrawals from this fund will be subject to the Redevelopment Authority's prior approval. Girard Bank has been given a first mortgage on all property owned or hereinafter acquired by Franklin Town as the quid pro quo. Under these circumstances, we find no insufficiency in this fund.

And finally, the Authority has received a second mortgage on all property now owned or after acquired by Franklin Town. The total assembled value of all the mortgaged property was $29,000,000.00 with $17,000,000.00 of that sum allocable to Girard Bank's first mortgage leaving the difference of approximately $12,000,000.00 as the value of the second mortgage. Admittedly, this fund is not as liquid or readily accessible as are the bond and letter of commitment funds, but we are satisfied that there exists enough security in the fund to make it sufficient for the purposes of preliminary objections.

Having concluded that the security is sufficient and having found that available funds are more than adequate to discharge the primary obligation to the condemnees under the Eminent Domain Code, we must dismiss Appellants' argument as to the quality and extent of the security.

In light of the foregoing, we affirm the order of the court below which dismissed the preliminary objections.