**CONDEMNATION OF 110 WASHINGTON STREET, BOROUGH OF CONSHOHOCKEN, PENNSYLVANIA, BY THE REDEVELOPMENT AUTHORITY OF THE COUNTY OF MONTGOMERY, FOR URBAN RENEWAL PURPOSES, The Premises Being Owned by Montgomery County Industrial Development Authority and R & J Holding Company.**

**R & J Holding Company, Appellant.**

Commonwealth Court of Pennsylvania.

Argued May 17, 2000.

Decided Feb. 13, 2001.

Richard L. Bazelon, Philadelphia, for appellant.

Gilbert P. High, Jr., Norristown, for appellee.

Before DOYLE, President Judge, COLINS, Judge, McGINLEY, Judge, FRIEDMAN, Judge, KELLEY, Judge, FLAHERTY, Judge, LEADBETTER, Judge.

### KELLEY, J.

R & J Holding Company (Condemnee) appeals from the order of the Court of Common Pleas of Montgomery County (trial court) that sustained in part and overruled in part Condemnee's preliminary objections to the Declaration of Taking filed by the Redevelopment Authority of the County of Montgomery (Condemnor). We reverse.

On January 1, 1986, Condemnor entered into an agreement (1986 Agreement) with the Greater Conshohocken Improvement Corporation (GCIC), whose principal is Donald Pulver (Pulver), which provided for a process intended to lead to the adoption of a redevelopment proposal in the Boroughs of Conshohocken and West Consho-hocken to eliminate blight. Under the 1986 Agreement, Condemnor was to acquire properties in a specified project area in the boroughs by eminent domain, and to convey them to Pulver for development. Specifically, under Section 3(c) of the 1986 Agreement, Condemnor was to, *inter alia,* "[a]cquire by Eminent Domain, any real property, including improvements and fixtures for the public purposes of the Urban Redevelopment Law [ (URL) [1] ] ..." R.R.[2] at 1065a. However, Section 3(d) of the 1986 Agreement also stated that "[n]otwithstanding anything to contrary contained herein, [Condemnor] shall not undertake any of the activities set forth in section[ ] ... 3(c) of this Agreement except at the specific request of [GCIC] ..." *Id.* at 1066a. In turn, GCIC was required to compensate Condemnor for all direct and indirect costs incurred in the course of these activities, and was to provide security for any takings in accordance with a formula set out in the agreement. *See Id.* at 1066a—1069a.

On October 13, 1993, Condemnor again entered into an agreement (1993 Agreement) with GCIC which specifically related to Condemnee's property. Under Section 1(a) of the 1993 Agreement, Condemnor agreed to "[f]orthwith, commence legal acquisition proceedings against [Condemnee's] property ..." *Id.* at 1328a—1329a. Likewise, under Section 1(c) of the 1993 Agreement, Condemnor agreed to "[t]ake whatever steps are necessary to acquire, pursuant to the Eminent Domain Code [ (Code) [3] ], and any other applicable statute, title to the fee and possession of [Condemnee's] premises ..." *Id.* at 1329a. Pursuant to Section 1(d) of the 1993 Agreement, Condemnor was to fund the acquisition of Condemnee's property by using the funds provided by a grant from the Commonwealth. *Id.* Under Section 2 of the 1993 Agreement, GCIC was to

---

1. Act of May 24, 1945, P.L. 991, *as amended,* 35 P.S. §§ 1701—1719.1.

2. "R.R." refers to the reproduced record filed in the instant appeal.

3. Act of June 22, 1964, Special Sess., P.L. 84, *as amended,* 26 P.S. §§ 1–101—1–903.

cover all direct condemnation costs that exceeded the grant amount. *See Id.* at 1329a—1332a. Finally, pursuant to Section 7 of the 1993 Agreement, it was agreed that "[n]either the Borough nor [Condemnor] are authorized to file a Declaration of Taking of [Condemnee's property] without the prior written consent of [GCIC]." *Id.* at 1335a.

On March 14, 1995, Condemnor entered into an agreement (Surety Agreement) with TBFA Partners (TBFA), whose principal is Pulver, in which the rights and obligations of GCIC under the 1993 Agreement were assigned to TBFA. *Id.* at 1075a. The Surety Agreement recognized that among the responsibilities and obligations which TBFA agreed to assume are those to pay any funds necessary for the acquisition of Condemnee's property which are not covered by the grant from the Commonwealth, and to provide surety to Condemnor that such payments would be forthcoming when due. *Id.* The Surety Agreement also stated that TBFA was desirous that Condemnor initiate condemnation proceedings to acquire Condemnee's property, and that TBFA was to post security for the taking in the amount of $775,000 less $247,035 attributed to costs already paid. *Id.* In particular, Paragraph 1 of the Surety Agreement stated that "[t]his surety is posted to induce [Condemnor] to commence acquisition and condemnation proceedings in order to acquire [Condemnee's property]." *Id.* at 1076a.

On March 15, 1995, Condemnor offered to purchase Condemnee's property for $1,180,000 plus reasonable relocation costs. *Id.* at 1302a. On July 11, 1996, Condemnor filed a Declaration of Taking for Con-

demnee's property.[4] *Id.* at 7a—15a. On August 26, 1996, Condemnee filed preliminary objections to the Declaration of Taking. *Id.* at 18a—30a. On June 4, 1997, Condemnee filed amended preliminary objections to the Declaration of Taking. *Id.* at 124a—139a. The preliminary objections alleged, *inter alia,* that the Declaration of Taking be set aside because: (1) Condemnor had unlawfully delegated its eminent domain powers to Pulver; (2) Condemnor had acted in bad faith in condemning the subject property; and (3) inadequate security had been posted for the condemnation.

On December 17, 1998, the trial court issued an order disposing of Condemnee's preliminary objections. The trial court overruled Condemnee's preliminary objections relating to unlawful delegation and bad faith. However, the trial court determined that the security that had been posted was inadequate, and ordered Condemnor to post an additional $750,000 in security. Condemnee then filed the instant appeal in this Court.

In this appeal, Condemnee claims: (1) the trial court erred in overruling its preliminary objection that Condemnor had unlawfully delegated its eminent domain powers to Pulver; (2) the trial court erred in overruling its preliminary objection that Condemnor had acted in bad faith; and (3) the trial court's evidentiary errors during the hearing on the preliminary objections requires a new hearing.

 We initially note that where a trial court has either sustained or overruled preliminary objections to a Declaration of Taking, our scope of review is limited to determining whether the trial court abused its discretion or committed an error of law. *In re Condemnation*

---

4. In the Declaration of Taking, Condemnor alleged that it was condemning Condemnee's property pursuant to Section 9 of the URL. *See* R.R. at 7a. Section 9(i) of the URL states, in pertinent part, that Condemnor has the power "[t]o acquire by eminent domain any real property, including improvements and fixtures for the public purposes set forth in this act ..." 35 P.S. § 1709(i). Likewise,

Section 12 of the URL states, in pertinent part, that "[t]he Authority may exercise the right of eminent domain in the manner provided by law for the exercise of such right by cities or counties, as the case may be, of the same class as the city or county in which such Authority is organized to operate ..." 35 P.S. § 1712.

*Proceeding by the Township of Lower Macungie*, 717 A.2d 1105 (Pa.Cmwlth.1998), *petition for allowance of appeal denied*, 558 Pa. 643, 738 A.2d 458 (1999); *Olson v. Whitpain Township*, 141 Pa.Cmwlth. 270, 595 A.2d 706 (1991). In addition, our review of the URL condemnation cases is to see that the redevelopment authority has not acted in bad faith or arbitrarily, that it has followed the mandated statutory procedures in preparing a redevelopment plan, and that there are no constitutional violations. *In re City of Scranton*, 132 Pa.Cmwlth. 175, 572 A.2d 250 (1990), *petition for allowance of appeal denied*, 527 Pa. 619, 590 A.2d 760 (1991).

Condemnee first claims that the trial court erred in overruling its preliminary objection that Condemnor had unlawfully delegated its eminent domain powers to Pulver. In particular, Condemnee argues that the provisions of the 1986 Agreement and the 1993 Agreement under which Condemnor was contractually precluded from acquiring its property by eminent domain constitutes an unlawful delegation of these powers. According to Condemnee, neither the URL nor the Code authorize a redevelopment authority to give private parties control over the authority's functions relating to condemnation. As a result, Condemnee asserts that because Condemnor acted in violation of its statutory authority, it exceeded its powers and its actions in condemning Condemnee's property are void.

 Article 1, Section 10 of the Pennsylvania Constitution provides, in pertinent part that "[n]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured." PA. CONST. art. 1, § 10. The power of the Commonwealth to acquire private property through the use of it eminent domain powers directly flows from its attributes as the sovereign. *See, e.g., Peters v. Reading*, 321 Pa. 220, 221, 184 A. 23, 24 (1936) ("[T]he right of eminent domain is an attribute of sover-

eignty, inherent in the State, to be exercised subject to applicable provisions of the Constitution and in accord with statutes regulating procedure. It is generally exercised by the State, or by agencies to which the State delegates the power, such as municipal corporations and others sometimes designated quasi-public corporations."). *See also People v. Adirondack Railway Company*, 160 N.Y. 225, 237, 54 N.E. 689, 692 (1899), *aff'd sub nom. Adirondack Railway Company v. People of the State of New York*, 176 U.S. 335, 20 S.Ct. 460, 44 L.Ed. 492 (1900) ("[T]he power of taxation, the police power and the power of eminent domain underlie the constitution, and rest upon necessity, because there can be no effective government without them. They are not conferred by the constitution, but exist because the state exists, and they are essential to its existence. They are not rights reserved, by rights inherent in the state as sovereign. While they may be limited and regulated by the constitution, they exist independently of it, as a necessary attribute of sovereignty. They belong to the state because it is sovereign, and they are a necessity of government. The state cannot surrender them, because it cannot surrender a sovereign power. It cannot be a state without them. They are as enduring and indestructible as the state itself ...") (citations omitted).

 However, the exercise of this sovereign power is not without limitation. Indeed, as the Pennsylvania Supreme Court stated long ago:

The right of the Commonwealth to take private property without the owner's assent on compensation made, or authorize it to be taken, exists in her sovereign right of eminent domain, and can never be lawfully exercised but for a public purpose—supposed and intended to benefit the public, either mediately or immediately. The power arises out of that natural principle which teaches that private convenience must yield to the

public wants. This public interest must lie at the basis of the exercise, or it would be confiscation and usurpation to exercise it ... The exercise of the right of eminent domain, whether directly by the state or its authorized grantee, is necessarily in derogation of private right, and the rule in that case is, that the authority is to be strictly construed. What is not granted is not to be exercised ...

*Lance's Appeal,* 55 Pa. 16, 25–26 (1867). *See also Winger v. Aires,* 371 Pa. 242, 244, 89 A.2d 521, 522 (1952) ("[I]t is to be emphasized, however, that the restriction in [Article 1, Section 10 of the Pennsylvania Constitution] is not *limited* to the guarantee of just compensation. The condemnation may not take place at all without authority of law."); *Olson,* 595 A.2d at 708 ("[W]e must emphasize that the exercise of eminent domain authority is in derogation of a private citizen's right to hold property; hence the authority to condemn property must be strictly construed. *Golding Condemnation Case,* [33 Pa. Cmwlth. 635, 382 A.2d 509 (1978)]. Eminent domain powers arise only when the legislature 'points out the occasions, the modes and the agencies for its exercise ... While the right to exercise the power may be delegated, the body to which the power is entrusted has no authority beyond that legislatively granted.' *Interstate Cemetery Company Appeal,* 422 Pa. 594 at 596–598, 222 A.2d 906 at 908–909 (1966).").

▮ Moreover, this power may not be delegated by agreement or contract. As the United States Supreme Court stated long ago:

[T]here can be now, in view of the many decisions of this court on the subject, no room for challenging the general proposition that the states cannot by virtue of the contract clause be held to have divested themselves by contract of the right to exert their governmental authority in matters which from their very nature so concern that authority that to restrain its exercise by contract would be a renunciation of power to legislate for the preservation of society or to secure the performance of essential governmental duties. ... [T]he right of government to exercise its power of eminent domain upon just compensation for a public purpose comes within this general doctrine.

*Contributors to Pennsylvania Hospital v. City of Philadelphia,* 245 U.S. 20, 23–24, 38 S.Ct. 35, 62 L.Ed. 124 (1917) (citations omitted). *See also Chesapeake & Ohio Railway Co. v. Greenup County,* 175 F.2d 169, 172 (6th Cir.1949) ("[A]ssuming, as is quite apparent, that Greenup County has breached its contract with the railroad company, there can be no estoppel successfully invoked against its condemnation of the right of way and easement which it seeks in this proceeding. A state (and, of course, a county) cannot by contract divest itself of its power of eminent domain: that is, to take private property for public use upon payment of just compensation to the owner. The power of eminent domain is 'so inherently governmental in character and so essential for the public welfare' as not to be susceptible of abridgement by agreement.") (citations omitted); *Evans v. Smyth–Wythe Airport Commission,* 255 Va. 69, 495 S.E.2d 825 (1998) (An Airport Commission could not relinquish its power or right of eminent domain; thus, a judgment entered pursuant to the Commission's settlement agreement with a landowner was void ab initio to the extent that it purported to limit the Commission's future rights to initiate condemnation proceedings against the landowner's property.); *City of Milwaukee v. Schomberg,* 261 Wis. 166, 169, 52 N.W.2d 151, 152 (1952) ("[N]or is the city prevented from taking the land by reason of its agreement not to do so. The power of eminent domain is inalienable and cannot be surrendered, even by legislation, to say nothing of the power of other governmental agencies to impair it or bargain it away. 'The power [of eminent domain] is inalienable, and no Legislature can bind itself or its succes-

sors not to exercise this power when public necessity and convenience require it.' 'By no form of contract or legislative grant can the state surrender its right to take any property within the limits of the state when it may be required for the public use.'") (citations omitted).

 As noted above, Condemnor has been granted the power of eminent domain through Sections 9(i) and 12 of the URL. However, nowhere in the URL does it provide that Condemnor may impair its ability to exercise this power through contract or agreement, or that it may be prohibited from exercising this power absent a redeveloper's written request. The General Assembly has bestowed upon Condemnor the power of eminent domain, and Condemnor may not compromise its authority to exercise this power based on the written consent of another party.

 It is clear that the actions of Condemnor in this case were beyond those conferred by the URL. It is true that Condemnor ultimately filed the Declaration of Taking for Condemnee's property. However, under the Agreements, Condemnor was purportedly not authorized to take this action without Pulver's prior written consent. Thus, Pulver directed the condemnation of Condemnee's property; Condemnor was merely acting on Pulver's behalf. Such an exercise of eminent domain is clearly beyond the provisions of the URL, and is patently without authority of law. Moreover, any agreement which purportedly transfers such power to a private individual must be deemed to be void and unenforceable.

 Condemnor asserts that even if its agreements with Pulver constitute an unlawful delegation, this is no basis for overturning the condemnation. We do not agree.

As noted above, in the Surety Agreement, the rights and obligations of GCIC under the 1993 Agreement were assigned to TBFA. R.R. at 1075a. The Surety Agreement also stated that TBFA was desirous that Condemnor initiate condemnation proceedings to acquire Condemnee's property, and that TBFA was to post security for the taking in the amount of $775,000 less $247,035 attributed to costs already paid. *Id.* In particular, Paragraph 1 of the Surety Agreement affirmatively stated that "[t]his surety is posted to induce [Condemnor] to commence acquisition and condemnation proceedings in order to acquire [Condemnee's property]." *Id.* at 1076a.

Thus, the Surety Agreement, like the 1986 Agreement and the 1993 Agreement, purported to confer upon Pulver the power to direct when Condemnor would initiate condemnation proceedings against Condemnee's property. Moreover, Pulver exercised this purported authority within the express terms of the Surety Agreement.

It is true that this Court has acknowledged the propriety of an agreement between a condemnor and a private developer whereby the developer agreed to provide the surety for a condemnation as required by Section 403 of the Code.[5] Indeed, as this Court has previously stated:

Condemnees argue that that the letter of credit provided by the developers is insufficient because section 403 of the [Code] requires that security be given by the condemnor. In *Condemnation Proceeding Redevelopment Authority of Philadelphia,* [19 Pa.Cmwlth. 272, 339 A.2d 885], *cert. denied,* [423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975)], this court held that condemnees had a

5. Section 403 of the Code states, in pertinent part:
 (a) Bond. Except as hereinafter provided, every condemnor shall give security to effect the condemnation by filing with the declaration of taking its bond, without surety, to the Commonwealth of Pennsylvania for the use of the owner or owners of the property interests condemned, the condition of which shall be that the condemnor shall pay such damages as shall be determined by law.
26 P.S. § 1–403(a).

right to challenge, by preliminary objection, the sufficiency of security provided by a private developer pursuant to an agreement between the developer and a redevelopment authority. The court went on to hold that the security was in fact sufficient. Although condemnees in that case do not appear to have been arguing that it was improper for the developer to provide the security, in holding that the security was sufficient, this court implicitly accepted the propriety of such an arrangement. We see no reason to hold differently here. Our concern is that sufficient funds are available for the payment of condemnation damages; our concern is not with the source of those funds.

*Appeal of Heim*, 151 Pa.Cmwlth. 438, 617 A.2d 74, 79 (1992).

However, as noted above, the Surety Agreement not only provides for Pulver to provide the required surety, but it also purports to confer upon him the authority to direct when Condemnor should condemn the property. In addition, under the Surety Agreement, Pulver purports to exercise this power and directs Condemnor to initiate condemnation proceedings against Condemnee's property.

As previously stated, any agreement which purports to transfer such power to a private individual must be deemed to be void and unenforceable. Moreover, because the requirements of Section 403 cannot be satisfied through this void agreement, the condemnation in this case must likewise be void. As a result, it is clear that the trial court erred in overruling Condemnee's preliminary objection to the Declaration of Taking filed by Condemnor.

Accordingly, the order of the trial court is reversed.[6]

### ORDER

AND NOW, this 13th day of February, 2001, the order of the Court of Common Pleas of Montgomery County, dated December 17, 1998 at No. 96–12612, is reversed.

FLAHERTY, J.

I respectfully dissent.

Although I agree with the Majority that the 1986 Agreement and 1993 Agreement are void and unenforceable, I disagree with the Majority's determination that the condemnation of Condemnee's property is also void.

According to the Agreements, although granted the power of eminent domain through Sections 9(i) and 12 of the URL, Condemnor ostensibly could not condemn property without the written consent of Pulver. As the Majority states, "the power of [eminent domain] is inalienable and cannot be surrendered, even by legislation, to say nothing of the power of other governmental agencies to impair it or bargain it away." *City of Milwaukee v. Schomberg*, 261 Wis. 166, 169, 52 N.W.2d 151, 152 (1952).

In this case, had the agreement purported to authorize Pulver to initiate condemnation proceedings on behalf of Condemnor, I would agree with the Majority that the subsequent condemnation would be void. Condemnor has been granted the power of eminent domain through Section 9(i) and 12 of the URL but nowhere in the URL does it provide that the Condemnor may delegate the power of eminent domain to another. The right of eminent domain is exclusively in the sovereign and "[w]hile the right to exercise the power may be delegated, the body to which the power is entrusted has no authority beyond that legislatively granted." *Interstate Cemetery Company Appeal*, 422 Pa. 594, 598, 222 A.2d 906, 909 (1966). As such, had Pulver attempted to initiate condemnation proceedings in the name of

---

**6.** Based on our disposition of this issue, we will not address the other claims raised in the instant appeal.

Condemnor, such would be void because such proceedings could only be undertaken by Condemnor. Similarly, because condemnation proceedings could only be initiated by Condemnor it matters not whether the Agreements purported to require Pulver's consent before such an undertaking was initiated. Condemnor at all times had the power to condemn and Condemnor acted lawfully in accordance with Sections 9(i) and 12 of the URL when it condemned Condemnee's property.

Because I conclude that the condemnation was proper, I would address the remaining issues raised on Condemnee.

First, the trial court did not err in overruling Condemnee's preliminary objections on the grounds of bad faith. Bad faith implies a tainted or fraudulent motive and it is palpable when it is readily perceived. *Redevelopment Authority of City of Erie v. Owners,* 1 Pa.Cmwlth. 378, 274 A.2d 244 (1971). One asserting bad faith or fraud must prove by clear, precise and indubitable evidence—that is, by credible witnesses testifying with detail to distinctively remembered facts. *In re Condemnation by City of Philadelphia of Leasehold of Airportels, Inc.,* 40 Pa.Cmwlth. 409, 398 A.2d 224, 226 (1979).

Here, Condemnee argues that the condemnation was conducted with the motive to benefit a private party at the expense of the Condemnee and is therefore unlawful and must be set aside. However, Condemnee did not allege this in preliminary objections. Because Section 406 of the Code, 26 P.S. § 1–406(a) provides that failure to raise a matter by way of preliminary objection shall constitute a waiver of such matter, the issue of private rather than public purpose is not properly before us.

Condemnee also argues that Condemnor acted in bad faith because it failed to provide adequate security for the taking of Condemnee's property. Here, the trial court agreed that the security posted was inadequate and ordered the additional posting of $750,000.00. However, merely because the security was found to be inadequate, it does not follow that the security was posted in bad faith. In fact the trial court credited the testimony of Sinclair (Trial court opinion at p. 76.) whose estimate Condemnor relied on in posting security. As such, we disagree with Condemnee that the security posted by Condemnor evidenced bad faith because there was substantial evidence for the trial court's credibility determination and a substantial lack of clear, precise and indubitable evidence of bad faith.

According to Condemnee, Condemnor's failure to obtain an appraisal of its property immediately before the filing of the declaration of taking and reliance on Sinclair's updated 1994 appraisal is also evidence of Condemnor's bad faith. However, none of the sections cited by Condemnee, 26 P.S. § 1–407, 26 P.S. § 1–409 and 26 P.S. § 1–602 require that an appraisal of the property be obtained before the filing of a declaration of taking. As such, there is also no credible evidence of bad faith in this regard.

Additionally, Condemnee argues that Condemnor's bad faith is evidenced by the fact that, before Condemnor filed the declaration of taking, it sent a letter to Condemnee on March 15, 1995, offering to buy the property for $1,180,000.00 which was $20,000.00 less than the 1994 appraised value. Condemnee maintains that this offer was intended to be an offer of just compensation. However, even assuming that this was an insufficient offer of just compensation, Section 406 preliminary objections are not available to a condemnee who is challenging just compensation alleged to have been tendered prior to the delivery of possession. *Township of Chester v. Department of Transportation,* 20 Pa.Cmwlth. 60, 339 A.2d 892 (1975).

Next, we will address whether the trial court committed evidentiary errors requiring a remand for a new hearing.

Condemnee sought to introduce a letter from Attorney Galante, who was retained by Condemnor to advise it on the appropriate amount of security for the condemnation. The letter advised Condemnor that the proposed security, i.e., the $1.5 million state grant, plus $711,000 from Pulver would not be adequate and recommended that the Developer's security be enhanced to $1 million. Condemnee sought to introduce the letter as evidence of bad faith on the part of Condemnor in posting inadequate security. The trial court refused to admit the letter on the grounds of privilege. Condemnee argues that the privilege was waived because it was disclosed to Pulver and privileges are waived when they are disclosed to a third party. Assuming arguendo that the privilege was waived we disagree with Condemnee that there is a showing of bad faith on the part of Condemnor by its refusal to act on Attorney Galante's advice. The case of *Airportels*, relied on by Condemnee is distinguishable.

In *Airportels*, which involved a de facto taking, the condemnee initiated proceedings by filing a petition for the appointment of viewers. The trial court thereafter dismissed the preliminary objections filed by the City of Philadelphia (City). City did not timely appeal the dismissal of its preliminary objections and as such the City's opportunity to contest whether a de facto taking had occurred was lost. Ultimately in the proceedings, the City entered its estimate of just compensation as zero dollars. Although the City maintained that two appraisers retained by it valued the property at zero, these appraisers did not testify nor were they identified and other appraisers retained by the City estimated just compensation at $4 million to $6.5 million. At the hearing, the City also maintained that no condemnation had in fact occurred. This court concluded that City's estimate of just compensation in zero amount "was not based on a judgment of the leasehold's value arrived at in good faith but that it was based on the City's continued insistence that the City

*had not condemned* Airportels' leasehold." *Airportels* 398 A.2d at 227. (Emphasis added.) Thus, in *Airportels,* this court determined that the offer of just compensation was based on City's belief that no condemnation had occurred. No such issue is present in this case. Moreover here, Condemnor based its determination of security on the advice of Sinclair who testified at the hearing. Merely because Condemnor posted security in an amount somewhat less than that suggested by Galante does not cause Condemnor's actions to constitute bad faith.

Condemnee also argues that the court erred in excluding from evidence documents that demonstrated that Pulver had testified untruthfully at the hearing on the adequacy of the security. However, as Condemnee has not challenged the trial court's determination as to the amount of security, the issue of Pulver's testimony is of no moment.

Next, Condemnee maintains that the trial court erred in allowing Authority's solicitor, Bruce Nicholson, to present extensive hearsay testimony. Condemnee argues that Nicholson, although not a member of Condemnor's staff, testified as to the reason Condemnor wanted to acquire Condemnee's property and what motivated Condemnor to adopt a resolution authorizing the filing of the declaration of taking. Condemnee alleges that admission of Nicholson's hearsay testimony was prejudicial because the trial court credited the testimony. However, we do not agree with Condemnee in this case that the trial court, by merely crediting Nicholson's testimony, prejudiced Condemnee thereby. To amount to reversible error, an evidentiary ruling must be shown not only to have been erroneous but harmful to the party complaining. *Hart v. W.H. Stewart Inc.,* 523 Pa. 13, 564 A.2d 1250 (1989). Here, Condemnee has failed to make such a showing warranting a new hearing.

Finally, Condemnee argues that the trial court erred in not allowing Condemnee to

introduce into evidence the standard agreement used by the Redevelopment Authority of the City of Philadelphia (PRA), which does not have provisions conditioning any exercise of the governmental powers of the PRA on the developer's authorization or approval. The trial court determined that the PRA agreement was irrelevant in this case and a trial court may exclude evidence it deems irrelevant. *Concorde Investments, Inc. v. Gallagher*, 345 Pa.Super. 49, 497 A.2d 637, 641 (1985). The type of agreement utilized by another redevelopment authority is irrelevant as to whether the Agreements at issue, which attempted to delegate certain functions to the developer, constituted an illegal delegation of power which was never exercised.

In accordance with the above, I would affirm the decision of the trial court.

Doyle, P.J., joins in this dissent.